IN THE UNITED STATES DISTRICT COURT **FILED**

FOR THE WESTERN DISTRICT OF OKLAHOMA  APR - 7 2015

CARMELITA REEDER SHINN, CLERK
U.S. DIST. COURT, WESTERN DIST. OKLA.
BY _____,DEPUTY

JARED WILLIAM JONES,      )
                             )
      Petitioner,        )
                             )
vs.                       )     Case No. CIV-09-1172-W
                             )
RANDALL G. WORKMAN, Warden,   )
     Oklahoma State Penitentiary,  )
                             )
      Respondent.[1]    )

## MEMORANDUM OPINION

This matter comes before the Court on the Petition for Writ of Habeas Corpus filed

by Oklahoma death row inmate Jared William Jones pursuant to 28 U.S.C. § 2254 (docket

entry no. 21).[2] Petitioner, who appears through counsel, challenges the convictions and

sentences entered against him in Oklahoma County District Court Case No. CF-2003-2046.

In that case, a jury found Petitioner guilty of three counts of First Degree Malice Murder

(Counts I, II, and III), and two counts of Shooting with Intent to Kill (Counts IV and V).

Petitioner was sentenced to death for each of the three murder convictions.  He was

---

[1] Pursuant to Fed. R. Civ. P. 25(d), Anita Trammell, who currently serves as warden of the Oklahoma State Penitentiary, is hereby substituted as the proper party respondent in this case.

[2] Reference to the parties' pleadings shall be as follows: the Petition for a Writ of Habeas Corpus shall be cited as (Petition at __); Respondent's Response to Petition for Habeas Corpus shall be cited as (Response at __); Petitioner's Reply shall be cited as (Reply at __).

sentenced to life imprisonment for each of the two convictions for shooting with intent to kill. The trial judge ordered all sentences to run consecutively.

Petitioner has presented 14 grounds for relief. Six of those grounds, Grounds One through Five, Ground Eleven and Ground Twelve, assert claims that, if meritorious, could entitle Petitioner to a new trial of his guilt as well as a new sentencing. The remaining grounds for relief present claims having the potential to warrant resentencing only. Respondent has responded to the Petition (docket entry no. 32), and Petitioner has replied (docket entry no. 38). In addition to the Petition, Petitioner has filed a motion for an evidentiary hearing (docket entry no. 26), to which Respondent has filed an objection (docket entry no. 33), and Petitioner has replied (docket entry no. 39). He has also filed a motion for discovery (docket entry no. 22). Respondent has filed a response to the motion (docket entry no. 23), and Petitioner has replied (docket entry no. 24). By order entered September 29, 2011, Vicki Miles-LaGrange, Chief Judge of the United States Court for the Western District of Oklahoma, denied the motion for evidentiary hearing but stated that "[i]f the Court determines at a later date that a hearing is needed, the parties will be notified accordingly." By a separate order entered that same date, Judge Miles-LaGrange addressed Petitioner's motion for discovery by granting his request for production of the videotaped interview of Carla Phillips, as well as his request for the production of all crime scene photographs, and denying all remaining discovery requests while noting that "[i]f the Court determines at a later date that discovery is needed and warranted, the parties will be notified at such time."

The Court has conducted a thorough review of the entire state court record,[3] the pleadings filed herein, and the applicable law, and has carefully considered all those materials in reaching its decision. It concludes, for the reasons stated herein, that Petitioner has failed to demonstrate that he is entitled to a new trial of his guilt. The Court finds, however, that Petitioner's first and second grounds for relief establish that he is entitled to a new sentencing. The Petition should, therefore, be conditionally granted to afford Petitioner a new sentencing proceeding.

## I. Procedural History

In May of 2005, Petitioner's case was tried to a jury which sentenced him to death for the First Degree Malice Murders of Pamela Karr, Brian Galindo, and Joel Platt, and to life in prison for Shooting with the Intent to Kill Tara Platt and Tara Johns. The jury found that the death sentence imposed for the murder of Pamela Karr was supported by the single aggravating circumstance of Petitioner's having knowingly created a great risk of death to more than one person. The jury found that the death sentences imposed for the murders of Brian Galindo and Joel Platt were supported by two aggravating circumstances: (1) Petitioner's having knowingly created a great risk of death to more than one person; and (2) the murders were especially heinous, atrocious, or cruel (O.R. III at 514-523).

In Case No. D-2005-599, Petitioner appealed his convictions to the Oklahoma Court of Criminal Appeals (the "OCCA"). In a published opinion, Jones v. State, 201 P.3d 869

---

[3] The state trial court's original record has been supplied and shall be cited as O.R. at __. The trial transcript shall be cited as Tr. Vol. __ at __. Motion transcripts shall be cited as M. Tr. (date) at __.

(Okla. Crim. App. 2009), the OCCA denied relief. Petitioner sought review by the United States Supreme Court of the OCCA's decision. His petition for writ of certiorari was denied on October 5, 2009. Jones v. Oklahoma, 558 U.S. 855 (2009). Petitioner also sought post-conviction relief from the OCCA. In an unpublished order entered April 27, 2009, the OCCA denied the post-conviction application. Jones v. State, Case No. PCD-2005-822, slip op. (Okla. Crim. App. 2009).

## II. Facts

In adjudicating Petitioner's direct appeal, the OCCA made a determination of the facts of the case. Pursuant to 28 U.S.C. § 2254(e)(1), these factual determinations are presumed correct absent clear and convincing evidence rebutting them. Following review of the record, the trial transcripts, and the admitted exhibits, this Court finds that the OCCA's factual summary is adequate and accurate. The Court therefore adopts the following summary as its own.

> [Petitioner] was convicted of shooting Joel Platt, Brian Galindo, [Pamela] Karr, Tara Platt and Tara Johns. Only the last two survived the shootings. The shootings were connected to [Petitioner's] relationship with Carla Phillips, his live-in girlfriend. [Petitioner] and [Carla] Phillips lived down the street from the Platt residence, where brother and sister, Joel and Tara lived and where the crime in question took place. Eight adults[4] and two

---

[4] The OCCA indicates that eight adults in addition to Petitioner were inside the Platt house when the shooting took place. The record establishes, however, that only seven adults in addition to Petitioner were present at the Platt residence at the time the shooting began. Those seven adults were Tara Platt, Joel Platt, Tara Johns, Osveldo "Ramone" Hernandez, Brian Galindo, Pamela Karr and Carla Philips. Kylee Clay, who was inside the Platt house when the Petitioner arrived, left the premises before the Petitioner drew his firearms from his pockets (Tr. Vol. III at 305, Tr. Vol. IV at 38 and 250, Tr. Vol. VI at 50). Furthermore, both Ramone Hernandez and Carla Philips fled from the house to the yard as the first shot was fired (Tr. Vol. IV at 44, Tr. Vol. VII at 47). This possible inaccuracy in the OCCA's factual summary has no bearing on the

children were in the Platts' home at the time of the shootings. Five of the adults[5] testified as witnesses for the State and [Petitioner] testified in his own behalf. While certain details of the circumstances leading up to and including the shootings vary among the witnesses, the State witnesses essentially testified to the following.

On the night of April 11, 2003, [Carla] Phillips and her young son went to the Platt residence, while [Petitioner] went to a car show. Before going to the show, [Petitioner] and his friends drank beer and wine and smoked marijuana. Meanwhile, at the Platt residence, [Carla] Phillips had joined Tara Platt, Tara Johns, and [two] other women in visiting, playing video games, drinking beer and smoking marijuana. While there were several children at the house early in the evening, by the time of the fatal confrontation, only Tara Platt's two children remained in the house, asleep in their beds. During the evening and into the early morning hours, [Carla] Phillips spoke with [Petitioner] several times over the phone. Their conversations included some amount of verbal sparring. After a conversation at approximately 2:36 a.m., April 12, [Petitioner] headed to the Platt residence, armed with two .45 caliber guns in his pockets.

By this time, Joel Platt, Brian Galindo, [Pamela] Karr, and Ramone Hernandez were at the Platt residence, having been at nightclubs earlier in the evening. Tara Platt was at the front door when she saw [Petitioner]'s car drive up. She opened here front door to see [Petitioner] get out of his car, walk to her house and inform her he had come to party with them. He entered the living room and asked for [Carla] Phillips. [Tara] Platt indicated [Carla] Phillips was in the back bedroom and she would get her for [Petitioner]. To get to the back bedroom, [Tara] Platt had to walk through the bedroom where her seven year old son was sleeping. Unbeknownst to [Tara] Platt, [Petitioner] followed her. He reached around her and pushed open to the door to the back bedroom. Angry that [Petitioner] had followed her into her son's room, she shoved him backwards, causing him to fall over a child size chair.

The ensuing argument over why [Petitioner] had forced open the door and why [Tara] Platt had pushed him, brought Joel Platt and Brian Galindo out

---

issues before this Court.

[5]Kylee Clay testified on behalf of the State but was not present at the Platt residence when Jared Jones began shooting. *See* footnote. 3.

from the bedroom. Joel Platt and [Brian] Galindo tried to calm [Petitioner] down and remove him from the child's bedroom either by placing him between the two of them with each grabbing an arm, or by Joel Platt placing his arm around [Petitioner's] shoulder and pushing him towards the door. [Petitioner] resisted their efforts to remove him from the room, saying he needed to talk with [Carla] Phillips. While coming through the doorway from the little boy's room into the living room, an intoxicated Joel Platt fell. He got up and took a "drunken swing" at [Petitioner], but missed him. Others in the house began telling, with some shouting, [Petitioner] to leave.

Despite continued efforts to get [Petitioner] to leave, [Petitioner], Joel Platt, and [Brian] Galindo ended up in the front bedroom which [Tara] Platt shared with her two year old daughter. [Tara] Platt told the men to leave and climbed onto her sleeping daughter's bed and covered her ears. Backed into a corner, [Petitioner] took out a gun, pointed it at Joel Platt's eyes, and announced he had 'two [.45s]." Joel turned to get Ms. Phillips. She entered the room, briefly spoke with [Petitioner], then left the house. At the sight of the gun, [Brian] Galindo put his hands in the air and told [Petitioner], "we've got children in the house, we don't need this, put the gun away." [Petitioner] fired [four] times at [Brian] Galindo, striking him in the chest. [Brian] Galindo fell in the middle of the bedroom floor. [Pamela] Karr rushed in and knelt by his side. [Petitioner] shot her twice in the head. Tara Platt put her head down and covered her daughter. [Petitioner] turned toward her and shot her in the shoulder and thumb.

Tara Johns was standing in the living room when she saw [Petitioner] shoot [Brian] Galindo. She grabbed a phone to call 911 and turned to see [Petitioner] facing her with a gun in each hand. She also saw Joel Platt facing [Petitioner]. [Petitioner] shot Tara Johns in the hip. She held on to the phone waiting for the dispatcher to pick up. [Petitioner] then shot her in the head. She was able to hold on until the dispatcher answered, then she fell to the floor. The 911 call recorded the rest of the events at the house. [Petitioner] fired two more shots and struck Joel Platt in the back of his head. He fired three more shots into Tara Johns as she lay on the ground.

After having been shot Tara Platt remained in her daughter's bedroom. She heard [Petitioner]'s screams and seven more gunshots. She then heard him leave thorough the front door. She picked up her daughter and started out of the bedroom. However, [Petitioner] met her at the door and forced her back into the house, cornering her near the bathroom door, which adjoined the

bedrooms. Attempting to protect her daughter, Tara Platt stood in front of her and begged [Petitioner] not to shoot them. [Petitioner] waved his guns in her face and mockingly said, "don't shoot me." By this time, [Petitioner]'s guns were empty. [Petitioner] ran out of the house and Tara Platt ran to look for a phone, unaware that Tara Johns had already called 911.

The State's witnesses all testified that once the shooting started the situation was chaotic. However, they all consistently stated the only physical contact with [Petitioner] was Joel Platt and [Brian] Galindo attempting to push him out the door. The witnesses testified there was no fighting and no one hit, kick[ed], punched or even threatened [Petitioner].

By contrast, [Petitioner] testified that during the altercation he felt trapped and described the group in the house as a "crazed mob" that was "tweaked out' on 'crank". [Petitioner] testified he was familiar with the drug from previous experience with his brother and his brother's friends, and that he recognized the smell and the crazy behavior its users exhibited.

[Petitioner] said the group used profanity and unnecessary force to remove him from the house, slammed him against a wall, restrained his arms and ultimately choked him. [Petitioner] claimed that as he reached for the guns inside the little girl's bedroom, Joel Platt grabbed him by his throat and began choking, possibly grabbing one of his hands in the process. [Petitioner] claimed he pulled a pistol from his left pocket, but [Brian] Galindo grabbed that arm. As he was about to black out, he pulled the other pistol from his right pocket and hit Joel [Platt] with it. According to [Petitioner], this did not stop the choking. As he and [Brian] Galindo struggled with the pistol, it went off and fell to the floor. [Petitioner] said [Brian] Galindo grabbed the gun, but [Petitioner] shot him with the other pistol. Someone grabbed the first pistol and moved toward [Petitioner], so he shot her. [Petitioner] said he [then] made his way to the living room, but found Joel [Platt] coming toward him. He shot Joel [Platt] and continued shooting as he ran out the front door, stating "they're going to kill me."

[Petitioner] offered no explanation for the shootings of Tara Platt and Tara Johns, but said he did not go to the Platt residence with the intention of killing anyone.

*Jones v. State*, 201 P.3d at 875-77. Beyond this summary of the evidence, additional facts will be discussed as they relate to the individual grounds for relief raised by Petitioner.

### III. Standard of Review

#### A. Exhaustion

As a preliminary consideration, the Court must determine whether Petitioner meets the exhaustion requirements of 28 U.S.C. §§ 2254(b) and (c). *See* Rose v. Lundy, 455 U.S. 509, 510 (1982). The exhaustion doctrine is a matter of comity. Id. at 518. In a federal system, "the States should have the first opportunity to address and correct alleged violations of state prisoner's federal rights." Coleman v. Thompson, 501 U.S. 722, 731 (1991). Pursuant to 28 U.S.C. § 2254(b)(2), "[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."

#### B. Procedural Bar

Beyond the issue of exhaustion, a federal habeas court must also examine the state court's resolution of the claim presented. "It is well established that federal courts will not review questions of federal law presented in a habeas petition when the state court's decision rests upon a state-law ground that 'is independent of the federal question and adequate to support the judgment.'" Cone v. Bell, 556 U.S. 449, 465 (2009) (quoting Coleman, 501 U.S. at 729). "The doctrine applies to bar federal habeas when a state court declined to address

a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement." Coleman, 501 U.S. at 729-30.

### C.    Merits

In accordance with the Antiterrorism and Effective Death Penalty Act of 1996 (the "AEDPA"), this Court's power to grant habeas corpus relief to state prisoners is limited. Snow v. Sirmons, 474 F.3d 693, 696 (10th Cir. 2007). Under the AEDPA, the standard of review applicable to each claim depends upon how that claim was resolved by the state courts. Alverson v. Workman, 595 F.3d 1142, 1146 (10th Cir. 2010) (citing Snow, 474 F.3d at 696). When a state prisoner presents a claim to this Court, the merits of which have been addressed in state court proceedings, this Court cannot grant habeas corpus relief upon the claim unless it determines that the state court proceedings resulted in a decision (1) "that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1), (2).

The focus of § 2254(d) is on the reasonableness of the state court's decision. To obtain relief, a petitioner must show that the state court decision is "objectively unreasonable." Williams v. Taylor, 529 U.S. 362, 409 (2000) (O'Connor, J., concurring but delivering the opinion of the Court with respect to Part II). "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether

9

that determination was unreasonable—a substantially higher threshold." <u>Schriro v. Landrigan</u>, 550 U.S. 465, 473 (2007). Review under § 2254(d) is limited to the record that was before the state court that adjudicated the claim on the merits. <u>Cullen v. Pinholster</u>, ——U.S.——, 131 S.Ct. 1388, 1398 (2011). Thus, "evidence introduced in federal court has no bearing on § 2254(d)(1) review. If a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before that state court." <u>Id.</u> at 1400 (footnote omitted).

"Under § 2254(d), a habeas court must determine what arguments or theories supported ... the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." <u>Harrington v. Richter</u>, 562 U.S. 86, 101-02 (2011). Relief is warranted only "where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents." <u>Id.</u> at 102. The deference embodied in § 2254(d) "reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." <u>Id.</u> (citation omitted).

## IV. Analysis

Petitioner was tried for three capital counts of First Degree Malice Murder and two counts of Shooting with Intent to Kill. His defense to all charges was based on his claim that he was attacked by the methamphetamine-intoxicated decedents, and that he acted out of fear

for, and in defense of his life. In Ground One and Ground Two of the Petition, Petitioner challenges evidentiary rulings that deprived him of forensic evidence of the decedents' methamphetamine use, as well as testimony that Petitioner bore signs of physical injury shortly after his arrest. Stripped of that evidence, Petitioner's defense was supported only by his own testimony and that of his hired crime-scene reconstruction expert, Tom Bevel.

At the close of evidence, the trial court instructed the jury not only with respect to First Degree Malice Murder and Shooting with Intent to Kill, but also with respect to manslaughter, as a lesser-included offense, and self-defense as a defense to all counts. Petitioner argues that the excluded evidence corroborated his defense, and that its exclusion had a substantial and injurious effect not only on the jury's guilt determination, but on its penalty decision as well. It is against that backdrop that the Court examines Petitioner's claims.

## A. Ground One: Exclusion of Evidence of Decedents' Drug Use

In his first ground for relief, Petitioner alleges that his right to present a complete defense to the criminal charges against him, as guaranteed by the Sixth, Eighth, and Fourteenth Amendments of the United States Constitution, was violated when the trial court excluded evidence that the decedents were intoxicated with the drug methamphetamine. The trial court excluded, on relevance grounds, reports from the Medical Examiner's Office establishing the presence of methamphetamine in the bodies of all three decedents ("the

toxicology reports").[6] The trial court also excluded evidence that methamphetamine was found on the premises of the Platt residence, (Tr. Vol. I at 7), as well as evidence that a quantity of methamphetamine and a pipe used for smoking the drug were found on the body of decedent Brian Galindo (Tr. Vol. IV at 217-18, Tr. Vol. VI at 129). In addition, the trial court excluded expert testimony regarding the effects of the methamphetamine consumed by the decedents (Tr. Vol. VI at 129-30).

The claim is exhausted as Petitioner raised it on direct appeal to the OCCA where it was denied on the merits. The OCCA found that the evidence concerning the decedents' methamphetamine use was relevant to Petitioner's self defense case, to the manslaughter lesser included offense, and to his mitigation case at sentencing. Jones, 201 P.3d at 882. It concluded that the trial court's exclusion of the evidence was manifestly unreasonable and an abuse of its discretion. Id. at 881-82. The OCCA refused to grant relief, however, as it concluded that the error did not have a substantial influence on the outcome of the trial and it did not deny Petitioner his right to present a defense. Id. at 882. Petitioner contends the OCCA's ruling is unreasonable.

---

[6]The toxicology reports showed Pam Karr's blood contained 2.0 micrograms per milliliter of methamphetamine, 0.18 micrograms per milliliter of amphetamine, and trace elements of diazepam and nordiazepam; Joel Platt's blood contained 0.82 micrograms per milliliter of methamphetamine, 0.16 micrograms per milliliter of amphetamine, and trace elements of diazepam and nordiazepam; and Brian Galindo's blood contained .25 micrograms per milliliter of methamphetamine and trace elements of diazepam and nordiazepam; Pam Karr's blood contained 2.0 micrograms per milliliter of methamphetamine, 0.18 micrograms per milliliter of amphetamine, and trace elements of diazepam and nordiazepam. Jones at 879, fn. 5.

"Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." Crane v. Kentucky, 476 U.S. 683, 690 (1986) (citations omitted); *see also* Holmes v. South Carolina, 547 U.S. 319, 324 (2006); Taylor v. Illinois, 484 U.S. 400, 408 (1988). The Supreme Court has established, "at a minimum, that criminal defendants have the right to the government's assistance in compelling the attendance of favorable witnesses at trial and the right to put before a jury evidence that might influence the determination of guilt." Taylor, 484 U.S. 400 at 408; Pennsylvania v. Ritchie, 480 U.S. 39, 56 (1987); Washington v. Texas, 388 U.S. 14, 19 (1967). "Few rights are more fundamental than that of an accused to present witnesses in his own defense." Taylor at 408 (citing Chambers v. Mississippi, 410 U.S. 284, 302 (1973)). Indeed, this right is an essential attribute of the adversary system itself. Taylor 484 U.S. at 408. It is "imperative to the function of the courts," which "depend on full disclosure of all the facts, within the framework of the rules of evidence." United States v. Nixon, 418 U.S. 683, 709 (1974).

Although the right to present a defense is fundamental, it is not unlimited. A defendant, for example, "must comply with established rules of procedure and evidence designed to assure both fairness and reliability." Chambers, 410 U.S. at 302. Thus, the accused "does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." Taylor, 484 U.S. at 410. Just

13

as a defendant's right to present a defense is limited, however, so too are the states' rulemaking powers. The exclusion of defense evidence on the basis of a state evidentiary or procedural rule "abridge[s] an accused's right to present a defense," where the restriction is "'arbitrary' or 'disproportionate to the purposes' [it is] designed to serve," and the evidence "implicate[s] a sufficiently weighty interest of the accused." United States v. Scheffer, 523 U.S. 303, 308–09 (1998) (quoting Rock v. Arkansas, 483 U.S. 44, 56 (1987)).

The balance of defendants' rights and states' interests requires that to establish a violation of his right to present a complete defense, Petitioner must make a two-part showing. First, he must show that evidence concerning the decedents' methamphetamine use would have been material and favorable to his defense. United States v. Valenzuela–Bernal, 458 U.S. 858, 867, 874 (1982). Second, he must show that the trial court's exclusion of the evidence was arbitrary or disproportionate to the evidentiary purpose advanced by the exclusion. Scheffer, 523 U.S. at 308; Rock, 483 U.S. at 56. The OCCA's opinion reveals that Petitioner made the requisite showing.

The OCCA found that evidence concerning decedents' methamphetamine use "would have corroborated [Petitioner's] testimony that the group of people he encountered in the house were under the influence of illegal drugs and acting unusually aggressive, thus causing him to fear for his life and act in defense of his life." Jones, 201 P.3d at 881-82. It further found that evidence regarding the decedents' intoxication levels was relevant to the manslaughter lesser offense option as it "might have convinced jurors that [Petitioner] was

acting out of a heat of passion, rather than with malice." Id. at 882. Finally, the court found that the excluded evidence "could also have been used to show witness bias and/or as mitigating circumstances for stage two proceedings." Id.

Implicit in the OCCA's findings is the court's determination that the excluded evidence was favorable and material to Petitioner's defense. In Valenzuela–Bernal, the Supreme Court held that excluded defense evidence is material if "there is a reasonable likelihood" that it "could have affected the judgment of the trier of fact." 458 U.S. at 874. By concluding that it "might have convinced jurors that [Petitioner] was acting out of a heat of passion, rather than with malice," the OCCA confirmed the reasonable likelihood that the excluded evidence could have affected the judgment of the jury. *See* Jones, 201 P.3d at 882.

Also implicit in the OCCA's ruling is its determination that the exclusion of Petitioner's evidence was not only disproportionate to, but actually unrelated to the evidentiary purpose advanced by the exclusion.    The trial court excluded the methamphetamine-related evidence on the ground that it lacked relevance under 12 Okla. Stat. § 2401. That provision defines relevant evidence as "evidence having any tendency to make the existence of a fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." The OCCA found that the evidence was relevant to every aspect of Petitioner's defense, that its exclusion lacked any legal basis, and that the trial court had, therefore, abused its discretion. In other words, the OCCA found the exclusion to be arbitrary.

The OCCA's ruling constitutes a determination that the trial court committed constitutional error by arbitrarily excluding favorable material defense evidence. Its conclusion that the exclusion did not "deny [Petitioner] the ability to present a defense" is irreconcilable with its own findings. The court supports its refusal to recognize constitutional error with the observation that the jury heard evidence that several of the victims used marijuana on the night of the shootings. It reasons that the evidence of marijuana use "could serve to corroborate [Petitioner's] description of those at the house as a 'crazy mob,' 'drugged up,' and 'tweaked out,' and the jury could have found the victims were the aggressors." Jones, 201 P.3d at 882. The court appears to suggest, in essence, that the methamphetamine evidence was merely cumulative of the marijuana evidence. Evidence is cumulative when it "goes to prove what has already been established by other evidence." Smith v. Secretary of New Mexico Dept. of Corrections, 50 F.3d 801, 829 (10th Cir.1995); see also Arizona v. Fulminante, 499 U.S. 279, 299,(1991). As Judge Chapel points out in his dissenting opinion,

> Even a lay person is aware that marijuana and alcohol use has very different effects and results in different behavior than the use of methamphetamine. Jones was making a very specific claim about a particular type of drug use commonly known to lead to aggressive behavior and bad judgment. This claim was supported by forensic evidence. I agree with the majority that the circumstances of this crime—Jones entered the house armed and shot multiple unarmed victims several times—make it unlikely that jurors would believe a self-defense claim. For that reason I find the admission of this evidence essential. Forensic evidence corroborating Jones's claim that his victims were high on methamphetamine might well have made a difference to jurors who were reviewing the possibility that he acted in the heat of passion, who were judging witness credibility, and who were reviewing mitigating circumstances.

Jones, 201 P.3d at 898.

Petitioner's defense rested on the specific allegation that he acted out of his fear of people in whose violent and belligerent behavior he recognized the distinctive signs of methamphetamine intoxication. As the OCCA conceded, the excluded evidence **"would have been the *only* evidence, aside from [Petitioner's] own testimony,"** supporting that defense. Id. at 882 (emphasis added). The methamphetamine-related evidence could not reasonably be considered cumulative of other evidence presented at trial. The trial court's arbitrary exclusion of such favorable material evidence was constitutional error. The OCCA's determination that it did not "deny [Petitioner] the ability to present a defense" is incongruent with the court's own analysis and is contrary to Supreme Court authority. *See* Valenzuela–Bernal, 458 U.S. 858; Scheffer, 523 U.S. at 308.

The OCCA's failure to acknowledge the constitutional import of the trial court's erroneous exclusion led it to an objectively unreasonable harmless error determination. While constitutional error is generally subject to harmless error analysis, it is well established that on direct appeal, such an error may be deemed harmless only after the State "prove[s] beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." Chapman v. California, 386 U.S. 18, 24 (1967). The OCCA did not require the State to meet the Chapman standard. Instead, citing its own decision in Simpson v. State, 876 P.2d 690, 702 (Okla. Crim. App. 1994), the OCCA ruled the erroneous exclusion to be harmless because it "did not have a substantial influence on the outcome of the trial." Jones

17

at 882. Simpson addressed the standard of review to be applied where an appellant urges fundamental error as "a vehicle to bring before [the OCCA] on appeal alleged errors which would otherwise be waived by failure to object at trial." Simpson, 876 P.2d at 701. In Simpson, the court made clear that where fundamental error does not amount to constitutional error, the appellant retains the burden of proving its substantial influence on the outcome of his trial. Id. at 701-702. No fairminded jurist could reasonably conclude that the Simpson harmless error standard applied by the OCCA comported with Chapman's requirement that the State prove a constitutional error to be harmless beyond a reasonable doubt. Accordingly, the OCCA's harmlessness determination is also contrary to clearly established Supreme Court authority. See Turrentine v. Mullin, 390 F.3d 1181, 1190 (10th Cir. 2004) (holding harmless error determination contrary to Supreme Court authority as the OCCA failed to apply the appropriate harmless error test on direct appeal).

Neither the OCCA's refusal to assign constitutional error nor its application of an improper harmless error test to that constitutional error is sufficient to entitle Petitioner to relief. To determine whether relief is warranted, this Court must conduct a de novo harmless error analysis applying the standard articulated in Brecht v. Abrahamson, 507 U.S. 619, 623 (1993). Under the Brecht standard, a habeas petitioner obtains plenary review to determine whether a constitutional error had a "substantial and injurious effect or influence in determining the jury's verdict." Id. at 637-38; see Welch v. Workman, 639 F.3d at 992. "In other words, when a state court fails to apply the proper harmless error standard under

Chapman (whether the error was harmless 'beyond a reasonable doubt'), the reviewing federal court must evaluate the trial court error under the Brecht standard (whether the error had a 'substantial and injurious effect or influence in determining the jury's verdict')." Fry v. Pliler, 551 U.S. 112, 121-22 (2007) (holding that regardless of the standard applied by a state court, the Brecht harmless error standard must be applied by the federal court on habeas review).

As the Tenth Circuit has instructed, Brecht's substantial and injurious standard must be construed and applied by this Court in light of the Supreme Court's subsequent decision in O'Neal v. McAninch, 513 U.S. 432 (1995). *See* Herrera v. Lemaster, 301 F.3d 1192, 1198 (10th Cir. 2002). In O'Neal, the Supreme Court held that when a federal habeas judge finds a constitutional error in a state court trial, but the record is evenly balanced such that the judge is in grave doubt about whether the error is harmless, "the uncertain judge should treat the error, not as if it were harmless, but as if it affected the verdict (i.e., as if it had a 'substantial and injurious effect or influence in determining the jury's verdict.')." 513 U.S. at 435. Consistent with O'Neal, the Tenth Circuit has consistently held an error's effect to be substantial and injurious where a court harbors grave doubt as to it's impact. *See* Lockett v. Trammel, 711 F.3d 1218, 1232 (10th Cir. 2013); Bland v. Sirmons, 459 F.3d 999, 1009 (10th Cir. 2006).

Respondent argues that under the Brecht standard, the trial court's erroneous exclusion of methamphetamine-related evidence was harmless. It notes that the State

adduced evidence contradicting Petitioner's testimony that the he acted out of fear of the aggressive individuals he encountered at the Platt residence. It further contends that the evidence of Petitioner's guilt was so overwhelming that the exclusion could not have had a substantial or injurious effect on the outcome of the trial. Response at 12-14. But, as the Supreme Court has clearly held,

> "[t]he inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, *or if one is left in grave doubt*, the conviction cannot stand."

O'Neal, 513 U.S. at 438 (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946) (emphasis added)).

Certainly the record establishes, and Petitioner does not deny, that he shot five individuals at the Platt residence in the pre-dawn hours of April 12, 2003. That the shootings resulted in death of three people and the severe injury of two others was never in question. Petitioner's first-stage defense was built entirely on his contention that his actions were a fear-driven response to the aggression of a group of individuals whose methamphetamine intoxication caused them to react in an extreme and violent manner to his attempts to speak with Carla Phillips. Petitioner testified that upon recognizing the smell of methamphetamine and the "crazy" behavior the drug induces, he became fearful for his life and acted out of and while in the grip of that fear. Evidence that the deceased victims had methamphetamine in their systems could have served as corroboration for Petitioner's testimony and might have bolstered the credibility of his assertion that his actions flowed from fear as opposed to

20

premeditation. As the OCCA noted, the excluded evidence "would have been the only evidence, aside from [Petitioner's] own testimony" supporting his defense. Id. at 882.

This Court is deeply troubled that the trial court deprived Petitioner of the opportunity to present evidence that could so clearly have strengthened his defense. It is also concerned that by failing to apply the harmless beyond a reasonable doubt standard, the OCCA deprived Petitioner of the prescribed analysis which would almost certainly have required that he be granted a new trial. This Court, however, is not empowered to restore to Petitioner those lost opportunities. It may grant habeas relief only if it harbors grave doubt as to whether the trial court's erroneous exclusion had a substantial and injurious influence on the trial. The Court is simply not persuaded that the methamphetamine-related evidence would altered the jury's guilt verdicts.

The trial court's erroneous exclusion of methamphetamine-related evidence does not entitle Petitioner to a new trial of his guilt. Neither does trial counsel's failure to adduce more evidence about the nature and effect of methamphetamine. Petitioner urges, as an alternative claim, that said failure amounted to ineffective assistance of counsel. The claim is exhausted having been raised on direct appeal and denied by the OCCA on the ground that Petitioner had failed to demonstrate that his counsel's performance not meet the first prong of the test prescribed by the Supreme Court in Strickland v. Washington, 466 U.S. 668, 687 (1984).

As set forth above, the trial erroneously determined that all evidence of the decedents' methamphetamine use was irrelevant absent proof that Petitioner had actual knowledge that

21

the decedents had ingested the drug. Petitioner attempted to meet the trial court's knowledge requirement by demonstrating that he recognized from the decedents' behavior and from the distinctive methamphetamine odor in the house, that the decedents were intoxicated with the drug. The trial court was unmoved and refused to modify its ruling. In light of those facts, the OCCA found that "no amount of evidence submitted in an offer of proof about the effects of methamphetamine use would have altered the trial court's ruling." Jones, 201 P.3d at 893. It concluded that counsel could not be deemed deficient for failing to present more evidence of a type the trial court had pronounced irrelevant and inadmissible.

Petitioner has failed to demonstrate that the OCCA's ruling is "objectively unreasonable." See Williams v. Taylor, 529 U.S. at 409. Many, if not most, reasonable jurists would concur with the court's determination. In addition, as this Court has found that the excluded evidence would not have substantially influenced the jury's guilt determination, Petitioner is unable to meet Strickland's requirement that he establish he suffered prejudice as a result of counsel's performance.

Although the Court concludes that exclusion of methamphetamine-related evidence did not substantially influence the guilt phase of Petitioner's trial, it finds that that same evidence might well have altered the jury's sentencing decision as it provided valuable mitigating evidence. The record reveals that Petitioner's second-stage presentation was minimal. Despite indications that serious mental illness that might have helped explain the extreme nature of Petitioner's reaction to the provocations he allegedly encountered at the

22

Platt residence, defense counsel opted instead to rest the mitigation case upon childhood privations and early traumas that shaped Petitioner's psychological development. As support for his second-stage defense, Petitioner relied upon the testimony of a single expert witness, Dr. Mary Wanda Draper, whose qualifications were a bachelor's degree in education, a masters degree in child development, and a Ph.D. in development. Tr. Vol. X at 138. The only additional second-stage evidence was character testimony offered by Petitioner's mother, father and uncle.

Petitioner's meager mitigation presentation made especially injurious the trial court's exclusion of the only factual evidence corroborating his claim that fear of the decedents' methamphetamine-fueled aggression drove his actions. The toxicology reports establishing decedents' methamphetamine ingestion, expert testimony regarding methamphetamine intoxication, and evidence that officers had found methamphetamine and its paraphernalia at the Platt residence could have significantly buttressed Petitioner's second-stage defense. Because Oklahoma permits only a unanimous jury to impose the death penalty, the exclusion of evidence sufficient to cause even one juror to strike a different balance presents a reasonable probability of harm. *See* Wiggins v. Smith, 539 U.S. 510, 537 (2003).

Viewing the record as a whole, the Court cannot escape the conclusion that the erroneous exclusion of material evidence had a substantial and injurious effect on the sentencing stage of Petitioner's trial. Habeas relief in the form of a new sentencing proceeding is therefore warranted with respect to Ground One.

**B. Ground Two: Exclusion of testimony of detention officer Robert Clark**

In his second ground for relief, Petitioner alleges that his constitutional right to present a defense was violated when the trial court erroneously excluded the testimony of defense witness Robert Clark. Mr. Clark, a former detention officer at the Oklahoma County Jail, was expected to testify that he saw bruises and scratch marks on Petitioner's neck at the time he was arrested, just hours after the homicides. The trial court excluded the testimony as a sanction for defense counsel's discovery violations including defense counsel's failure to timely identify Mr. Clark and the substance of his testimony. Petitioner contends, as an alternative ground for relief, that counsel's discovery violations constitute ineffective assistance of counsel.

The claims asserted in Petitioner's second ground for relief are exhausted, having been raised on direct appeal to the OCCA, which rejected it on the merits. The OCCA summarized the facts leading to the trial court's sanction as follows:

> The record reflects the defense filed its first witness list approximately three months before the August 30, 2004, trial date, and Robert Clark was not listed. Changes in counsel necessitated a continuance and trial was reset for December 2004, February 7, 2005, and February 14, 2005. On February 4, 2005, the defense filed an additional witness list and included Robert Clark's name for the first time, an address in Bethany, Oklahoma, and stated that Clark would testify that he was with [Petitioner] prior to the homicides. The same day the State filed a demand for more specific discovery specifically requesting more information on Robert Clark and his proposed testimony. On February 11, 2005, the defense requested funds to hire Tom Bevel as an expert and the trial was again reset for May 9, 2005. At a status conference held April 4, 2005, defense counsel informed the court he anticipated interviewing a jailer who processed [Petitioner] the day he was arrested, he would provide an updated witness list, and he would provide Tom Bevel's report by that

Friday. On April 15, 2005, the defense endorsed Tom Bevel as a witness but did not include a name for the jailer who allegedly processed [Petitioner] into jail.

As their last stage witness, the defense called Robert Clark informing the court he was the detention officer on duty when [Petitioner] was arrested and would testify that he observed bruises and scratch marks on [Petitioner's] neck. The State objected on the grounds of lack of notice and argued that the discovery it had received listed Clark as testifying he was with [Petitioner] the night of the homicide[s]. Defense counsel responded that when he prepared the initial witness list including Clark's name he did not know that the witness would testify to and that he had just found out the subject of Clark's testimony that day. The trial court noted that the address given for Clark was his home address and that his name had not been included on the list of witnesses read to the jury. The court informed defense counsel she had seen the witness the day before when he was brought to her chambers and introduced as a witness. The trial court determined that someone on the defense team knew the substance of Clark's testimony prior to that day and could have provided the State with the information and given them time to prepare. In the absence of such notice, the court found the discovery violation deliberate and ruled Clark would not testify.

Jones at 883.

The OCCA observed that the exclusion of evidence as a sanction for the violation of discovery rules is a severe remedy which could arise to the level of a Sixth Amendment violation if the exclusion concerned a material defense witness. Jones, 201 P.3d at 883. Thus, "[e]xcluding a material defense witness is appropriate only where the discovery violation is 'willful and motivated by a desire to obtain a tactical advantage that would minimize the effectiveness of cross-examination and the ability to adduce rebuttal evidence.'" Id. (quoting White v. State, 973 P.2d 306, 311(Okla. Crim. App. 1998) (exclusion of material testimony as sanction for non-willful discovery violation held

25

reversible error)). "Where the discovery violation is not willful, blatant or calculated gamesmanship, alternative sanctions are adequate and appropriate." Id. After considering the totality of circumstances surrounding Mr. Clark's designation as a witness, the OCCA determined that defense discovery violations were due more to **"*poor preparation* by defense counsel than a *willful desire* to gain a tactical advantage."** Jones, 201 P.3d at 883 (emphasis added). The OCCA concluded that given the lack of willfulness on the part of defense counsel, exclusion of a material witness such as Mr. Clark was too harsh a sanction for the violation committed and was, therefore, erroneous. The court found, however, that neither the trial court's error nor "defense counsel's apparent ineffectiveness in the matter" warranted relief. Id. The parties differ in their interpretation of the state's court's disposition.

Petitioner asserts that the OCCA recognized the trial court's exclusion to constitute a Sixth Amendment error, but then denied relief based on an unreasonable conclusion that the error was harmless. Respondent maintains that the OCCA found no constitutional error and that its ruling is consistent with federal law as applied by the Tenth Circuit in Young v. Workman, 383 F.3d 1233 (10th Cir. 2004) (holding that barring evidence as a sanction for discovery violations is not constitutionally impermissible where the excluded evidence is not material). This Court finds the OCCA's brief analysis to be somewhat opaque. Certainly the court unequivocally held the trial court's exclusion to be erroneous. The designation of error appears to arise out of the court's reasoning that because Mr. Clark's testimony was material

to the defense, its exclusion was an excessive sanction for defense counsel derelictions owing more to disorganization than design. The logical progression of the court's reasoning dictates that the erroneous exclusion amounted to Sixth Amendment error. However, after recognizing the error, the OCCA proceeded to deem it harmless as follows:

> "[g]iving [Petitioner] the benefit of the defense of self-defense, as the trial court did, even without Clark's testimony, Appellant was still able to present to the jury testimony and photographs supporting his claim of injuries suffered at the hands of Joel Platt. Appellant testified to his alleged injuries and how they occurred. Defense forensics expert Tom Bevel identified a photograph wherein he stated he could see a scratch on Appellant's neck.
>
> Id. at 883.

Although the court failed to indicate the harmless error test it employed, it is clear that it did not apply the "harmless beyond a reasonable doubt" standard prescribed by Chapman. In light of its failure to apply Chapman, and in light of its treatment of the excluded methamphetamine evidence at issue in Ground One, it is possible the court determined that the exclusion of Mr. Clark's testimony did not implicate Petitioner's constitutional rights. Such a determination, however, would not only contradict the OCCA's own analysis, it would be objectively unreasonable.

As discussed more fully with respect to Ground One, Petitioner had a constitutionally protected right to present a complete defense to the charges against him. *See* Ground One at pages 12-14; *see also* Valenzuela–Bernal, 458 U.S. at 867; Scheffer, 523 U.S. at 308. That right included the right to offer witnesses to establish his version of the facts. Washington v. Texas, 388 U.S. at 19. "Just as an accused has the right to confront the

27

prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense." Id. The right to present a complete defense is a fundamental element of due process of law. Id. The exclusion of reliable material defense evidence on the basis of a state evidentiary or procedural rule "abridge[s] an accused's right to present a defense" where the restriction is "'arbitrary' or 'disproportionate to the purposes' [it is] designed to serve." Scheffer, 523 U.S. at 308–09.

The OCCA explicitly ruled the trial court's exclusion of Mr. Clark's testimony to be an excessive, i.e., disproportionate sanction for defense counsel's non-willful violation of discovery rules. In so ruling, the court gave every appearance of having acknowledged the materiality of Mr. Clark's testimony to Petitioner's defense. That defense to multiple serious felony charges, including three counts of capital murder, rested on Petitioner's claim that he acted in self defense against an attacking mob. No fairminded jurist could doubt there was a reasonable likelihood that the jury's judgement could have been affected by an eyewitness' testimony that he saw scratches and bruises on Petitioner's neck just hours after the homicides. Contrary to the OCCA's suggestion, Mr. Clark's testimony was not cumulative of Petitioner's testimony or the expert testimony offered by Tom Bevel. Mr. Bevel did not observe Petitioner at the time of his arrest. He could testify only to impressions he gleaned from photographs shown to him by prosecutors for the first time at trial. Tr. Vol. IX at 19-21. By testifying that he personally observed the signs of fresh injury to Petitioner's neck just hours after his arrest, Mr. Clark could have corroborated Petitioner's account of

28

events in a way Mr. Bevel could not. His testimony could also have rebutted the testimony of Officer Todd Deaton and Detective Ken Whitebird, both of whom stated that they had not noticed injuries to Petitioner's neck at the time of his arrest. Tr. Vol. VII at 219, 240.

Because the materiality of Mr. Clark's testimony is beyond reasonable dispute, his erroneous exclusion as punishment for defense counsel's non-willful discovery violations abridged Petitioner's constitutionally-protected right to present his defense. Accordingly, it is incumbent upon this Court to assess whether that violation had a substantial and injurious effect in determining the jury's verdict. Brecht at 637-38. "A substantial and injurious effect exists if a court finds itself in grave doubt about the effect of the error on the jury's sentencing decision." Lockett, 711 F.3d at 1232 (brackets and internal quotation mark omitted). Thus, "when a court is in virtual equipoise as to the harmlessness of the error under the Brecht standard, the court should treat the error as if it affected the verdict." Fry, 551 U.S. at 121 n. 3, (ellipses and internal quotation marks omitted).

Petitioner went to trial confessing that he was armed with two 45-caliber weapons when he entered the Platt residence, which was filled with unarmed people. He confessed to shooting two men and a woman and did not deny shooting two additional women. See Jones 201 P.3d at 875-76. Certainly, absent some measure of corroboration, any reasonable jury would be inclined to regard his testimony with considerable skepticism. The corroborating testimony of a disinterested witness who personally observed Petitioner shortly after the

homicides held the potential to influence the jury's perception of the case. As Judge Chapel

observed in his dissenting opinion:

> Clark could have presented eyewitness testimony which corroborated
> [Petitioner's] claims that he had fought with the victims. While this was
> certainly subject to impeachment, it would have provided jurors confirmation
> of [Petitioner's] story. The evidence came not from [Petitioner's] friends or
> family but from a detention officer, which might have made it more credible
> in jurors' eyes. This claim must be analyzed in light of the juror's inability to
> consider forensic evidence, which also supported [Petitioner's] story. Taken
> together these two rulings prevented jurors from hearing any independent
> evidence supporting [Petitioner's] claims, or considering it as they deliberated.
> I simply cannot find that exclusion of this evidence could have had no effect
> on the jury's decisions.

Jones, 201 P.3d at 898.

Not only Petitioner's assertion of self defense, but also his manslaughter case and his

mitigation presentation relied upon his allegation that he was attacked by an aggressive mob.

Mr. Clark's testimony had the potential to affect all three of those aspects of the jury's

deliberations. It was valuable not only in it's own right as evidence that Petitioner had been

involved in a physical altercation with persons at the Platt residence, but also as support for

Petitioner's credibility, which was necessarily undermined by the trial court's erroneous

exclusion of all objective evidence of the decedents' methamphetamine use.

In conducting its harmless error review, the Court is required to consider the record

as a whole. That record includes the OCCA's determination that several serious errors beset

Petitioner's trial, a trial in which the State passionately urged jurors not only to convict

Petitioner of three counts of first degree malice murder, but also to reject as punishment

therefor, any lawful sentence short of death. The state court held the errors to be harmless whether considered individually or in aggregate. The two errors addressed herein as Ground One and Ground Two precluded the jury from evaluating, or even learning the existence of, relevant and admissible evidence that lent independent support to important elements of Petitioner's defense and mitigation case.

The Court does not diminish the strength of the State's evidence. It was sufficient to all but guarantee guilt verdicts with respect to the homicide counts. The Court is, therefore, confident that the erroneous exclusion of Robert Clark's had only a minimal impact on the jury's guilt determination. Thus neither the trial court's error nor counsel's discovery deficiencies warrant a new trial of Petitioner's guilt. However, the Court harbors the gravest doubt as to the injurious effect of the exclusion of such valuable mitigation evidence on the jury's sentencing decision. In accordance with applicable Supreme Court and Tenth Circuit authority, a court possessed of such doubt must treat the trial court's error as though it had a substantial and injurious effect on the jury's verdict.

In light of the record before it, and its grave doubt as to the effect of the erroneous exclusion on the jury's sentencing decision, the Court finds that habeas relief is warranted with respect to Ground Two and Petitioner should be granted a new sentencing proceeding.

## C. Ground Three: Admission of hearsay testimony.

Petitioner alleges that his Confrontation Clause rights under the Sixth Amendment were violated when investigating officer Ricky Hernandez was permitted to give hearsay

31

testimony as to statements made by Carla Phillips at the crime scene. The claim was raised on direct appeal and is exhausted.

On direct appeal, the OCCA noted that Petitioner claimed Officer Hernandez' testimony "violated his rights under the Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution," and that "he was unduly prejudiced by the testimony as Phillips' statements were 'radically different' from the trial testimony of all the other eye witnesses, including Phillips herself and was the first rendition of the events surrounding the homicides that the jury heard.'" Jones, 201 P.3d at 884. Because defense counsel lodged no objection to the hearsay testimony when it was introduced at trial, the OCCA reviewed the claim for plain error only. Id. Respondent argues that the OCCA's disposition constitutes a recognition that the claim was waived by trial counsel's failure to object, and that appellate review of the claim was procedurally barred. It contends that this Court's habeas review of the claim is, likewise, barred. Response at 30.

When a state court dismisses a federal claim on the basis of noncompliance with adequate and independent state procedural rules, federal courts ordinarily consider such claims procedurally barred and refuse to consider them. Clayton v. Gibson, 199 F.3d 1162, 1170–71 (10th Cir.1999). Petitioner insists that habeas review is not barred in this instance because the OCCA's plain error analysis was not independent of federal law. Petition at 20-21.

In Oklahoma, plain error, formerly known as "fundamental error," "arises from those 'errors affecting substantial rights although they were not brought to the attention of the court.'" Primeaux v. State, 88 P.3d 893, 907 (Okla. Crim. App. 2004) (quoting Jones v. State, 772 P.2d 922, 925 (Okla. Crim. App. 1989)); Simpson v. State, 876 P.2d at 694. Plain error has also "been defined as an error which goes to the foundation of the case, or which takes from a defendant a right essential to his defense." Simpson, 876 P.2d at 698. Pursuant to Oklahoma law, plain error consists of: 1) an actual error (i.e., deviation from a legal rule); 2) that is plain or obvious; and 3) affects a defendant's substantial rights (i.e., affects the outcome of the proceeding). See Hogan v. State, 139 P.3d 907, 923 (Okla. Crim. App. 2006); Simpson v. State, 876 P.3d at 698; 20 Okla. Stat. § 3001.1. If those elements are met, the court will correct the plain error only if it "seriously affect[s] the fairness, integrity or public reputation of the judicial proceedings" or otherwise represents a "miscarriage of justice." Simpson, 876 P.3d at 701 (citing United States v. Olano, 507 U.S. 725, 736 (1993)). Only structural errors, i.e., defects that affect the framework within which the trial proceeds, rather than simply an error in the trial process, require reversal regardless of whether they affected the outcome. Arizona v. Fulminante, 499 U.S. at 309-311.

The OCCA found that because "Ms. Phillips' out-of-court statements were offered [by Officer Hernandez] for the truth of the matter asserted and with no applicable hearsay exception, it was error to admit the testimony." Jones, 701 P.3d at 884. The court determined, however, that the actual error did not have a substantial influence on the

33

outcome of the trial because Ms. Phillips' out-of-court statements were not "radically different" from her trial testimony. The court also observed that Officer Hernandez and, eventually, Ms. Phillips were subject to cross-examination. Finally, the court noted that the jury heard testimony from other witnesses that contradicted Ms. Phillips statements to Officer Hernandez. Thus, the OCCA concluded that the actual error did not rise to the level of plain error and Petitioner was not entitled to relief. Id. at 884-85.

The Court agrees with Petitioner that the OCCA's plain error analysis reached the merits of his Confrontation Clause claim and was not, therefore, independent of federal law. *See* Black v. Workman, 682 F.3d 880, 918 (10th Cir. 2012) (to be independent, "the state law ground must have been the exclusive basis for the state court's holding"); *see also* Smith v. Workman, 550 F.3d 1258, 1274 (10th Cir. 2008)); Moore v. Reynolds, 153 F.3d 1086, 1096 (10th Cir. 1998). In Ake v. Oklahoma, the Supreme Court held that Oklahoma made application of its procedural bar "depend on an antecedent ruling on federal law, that is, on the determination of whether federal constitutional error has been committed. Before applying the waiver doctrine to a constitutional question, the state court must rule, either explicitly or implicitly, on the merits of the constitutional question." 470 U.S. 68, 75 (1985). Thus, "when resolution of the state procedural law question depends on a federal constitutional ruling, the state-law prong of the court's holding is not independent of federal law, and our jurisdiction is not precluded." Id. Although Ake was not a habeas case, the Tenth Circuit has made clear that its holding is applicable on habeas review. *See* Black, 682

F.3d at 919 ("this court has repeatedly followed the Ake test in § 2254 proceedings, and we

do so again here"); *see also* Brecheen v. Reynolds, 41 F.3d 1343, 1354 (10th Cir.1994);

Gutierrez v. Moriarty, 922 F.2d 1464, 1469 (10th Cir.1991).

Following the enaction of the AEDPA, the Tenth Circuit examined how the Act and

its deference principles intersected with state plain-error review and procedural bar. It noted

that a state court:

> may deny relief for a federal claim on plain-error review because it finds the
> claim lacks merit under federal law. In such a case, there is no independent
> state ground of decision and, thus, no basis for procedural bar. Consistent with
> that conclusion, the state court's disposition would be entitled to § 2254(d)
> deference because it was a form of merits review. On the other hand, a state
> court could deny relief for what it recognizes or assumes to be federal error,
> because of the petitioner's failure to satisfy some independent state law
> predicate. In such a case, that non-merits predicate would constitute an
> independent state ground for decision which would warrant application of
> procedural-bar principles on federal habeas. If the state procedural bar were
> then excused for some reason, the federal court would be left to resolve the
> substantive claim de novo, unconstrained by § 2254(d).

Cargle v. Mullin, 317 F.3d. 1196, 1206 (10th Cir. 2003), (citations omitted).

Because the availability of habeas review depends on the nature of the state court's

disposition, a federal habeas court must carefully examine the state court's ruling. After

careful examination, this Court concludes that the OCCA determined that Petitioner's federal

Confrontation Clause claim lacked merit. The claim, is, therefore, properly before this Court

for habeas review. As the OCCA's determination is entitled to AEDPA deference, however,

it must be upheld unless it is contrary to or an unreasonable application of established federal

law. Cargle, 317 F.3d at 1202.

Petitioner has not shown the OCCA's ruling with respect to the hearsay testimony to be unreasonable. Although they overlap, the hearsay rules and the Confrontation Clause are not coterminous. *See* California v. Green, 399 U.S. 149, 155-56 (1970). "[M]erely because evidence is admitted in violation of a long-established hearsay rule does not lead to the automatic conclusion that confrontation rights have been denied." Id. Generally, admission of hearsay testimony violates a defendant's constitutional rights only where there was no opportunity to examine the hearsay declarant in court. *See* U. S. v. Owens, 484 U.S. 554, 557 (1988) (the Confrontation Clause "has long been read as securing an adequate opportunity to cross-examine adverse witnesses"). It is undisputed that Carla Phillips testified at Petitioner's trial and was subject to his cross-examination. Petitioner has pointed the Court to no authority holding the Confrontation Clause to have been abridged in such a context. As the trial court's admission of Officer Hernandez' hearsay account does not constitute a clear federal error, it cannot support Petitioner's request for federal habeas relief.

Petitioner maintains that even if the hearsay admission did not itself constitute constitutional error, his counsel's ineffectiveness in failing to lodge objection does. The ineffectiveness claim is exhausted having been raised by Petitioner on direct appeal and rejected by the OCCA. The OCCA held that "[c]ounsel's failure to object to the evidence does not constitute ineffective assistance of counsel as [Petitioner] has failed to show a reasonable probability that had counsel raised an objection, the result of the trial would have been different." Jones, 201 P.3d 884-85. Thus, while the state court conceded counsel's deficiency, it determined that Petitioner had not demonstrated prejudice as required by the

standard set forth in Strickland, 466 U.S. at 687. The OCCA's denial of both the hearsay

claim and the related ineffectiveness claim was based primarily on its assessment that Officer

Hernandez' hearsay account of Carla Phillips' statement did not differ dramatically from the

testimony Ms. Phillips offered in court. Petitioner argues that assessment constitutes an

unreasonable determination of the facts under § 2254(d)(2). Pursuant to § 2254(d)(2), a

habeas court need not grant deference where a state court's adjudication "resulted in a

decision that was based on an unreasonable determination of the facts in light of the evidence

presented in the State court proceeding." However, this Court must presume state court

factual findings to be correct unless Petitioner rebuts that presumption by clear and

convincing evidence. § 2254(e)(1).

Petitioner contends that such clear and convincing evidence is provided by the trial

record. The record shows that Officer Hernandez was just the second witness called by the

State and that he presented the State's first account of the events surrounding the homicides.

He testified that upon arriving at the Platt residence on the night of the shootings, he spoke

with Carla Phillips who said she and Petitioner had been fighting and had engaged in a

heated telephone argument around fifteen minutes prior to Petitioner arriving at the house.

Tr. Vol. III at 245-46. Officer Hernandez stated that Ms. Phillips told him Petitioner entered

the Platt residence uninvited then immediately confronted her in the living room of the house

and quickly became violent. Tr. Vol. III at 246. He further stated that Ms. Phillips told him

that when one of the men in the house ordered Petitioner to leave, he pulled out his firearms

and began randomly shooting people. Tr. Vol III at 246-47. According to Officer Hernandez,

Ms. Phillips stated that the men in the house attempted to act as peacemakers and no one ever attacked Petitioner. Tr. Vol. III at 247-250.

Petitioner points out that this account differs substantially from the one offered by Ms. Phillips on the stand. She testified that while she had bickered with Petitioner over the phone earlier in the evening, the call was nothing out of the ordinary. Tr. Vol. VII at 10-12. She further testified that she was in the back bedroom of the house when Petitioner arrived and that she learned of Petitioner's presence at the Platt residence when Tara Platt informed her he was there. Tr. Vol. VII at 15-17. Only after Tara Platt showed Petitioner to the back bedroom did Ms. Phillips become aware of any disturbance when she heard Tara Platt say "[y]ou're not going to do this here." Tr. Vol. VII at 19. Ms. Phillips stated that she did not actually see Petitioner until he had already been pushed or backed into a corner of the next room by Tara Platt. Tr. Vol. VII at 19. She further testified that she saw Petitioner become aggressive only after the occupants of the house had blocked him from seeing or speaking with her and after Joel Platt had taken a drunken swing at him. Tr. Vol. VII at 20-21, 31, 37-43.

In his dissenting opinion, Judge Chapel too observed that Ms. Phillips' account of the events surrounding the shootings contrasted starkly with the hearsay account presented by Officer Hernandez. Judge Chapel noted that the hearsay testimony coincided in some particulars with the courtroom testimony of Ms. Phillips and others, but concluded that:

> the main point of Phillips's statement to Hernandez—and the question at issue in the trial—is that without arguing with any of the victims, and after being asked to leave once, Jones began shooting randomly at the people in the house.

This differs dramatically from Phillips's trial testimony, testimony of other witnesses, and Jones's story, all of which state that Jones began arguing with Tara Platt and the conflict escalated before the shooting began.

Jones, 201 P.3d at 899. Petitioner contends that this discrepancy was not cured by the opportunity to cross examine Ms. Phillips because the she did not testify until days later. By that time, Petitioner argues, Officer Hernandez' incendiary and erroneously admitted account had settled unchallenged in the jurors' minds.

The trial record would appear to provide clear and convincing evidence that the OCCA's factual finding was less than reasonable. But the OCCA's determination that counsel's deficiency did not prejudice Petitioner was based not just on its factual determination that Officer Hernandez' testimonial hearsay was not "radically" different from Ms. Phillips' in-court testimony. It was also based on the court's observations that Officer Hernandez was subject to cross examination, that Ms. Phillips herself was eventually called to the witness stand, and that other trial witnesses contradicted the hearsay account. Pursuant § 2254(d), a habeas court must determine what arguments or theories supported or ... could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." Richter, 562 U.S. at 102. Relief is warranted only "where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents." Id. This Court believes reasonable jurists could conclude that, taken together, the totality of trial testimony ameliorated the harm created by the erroneously admitted hearsay. This Court must,

therefore, defer to the OCCA's conclusion that Petitioner failed to show "a reasonable probability that had counsel raised an objection, the result of the trial would have been different." Accordingly, Petitioner is not entitled to habeas relief on Ground Three.

## D.    Ground Four: Counsel's ineffectiveness in failing to develop and present mental health evidence

In his fourth ground for relief, Petitioner asserts that his Sixth, Eighth and Fourteenth Amendment rights to effective assistance of counsel were violated when his both his trial and appellate counsel failed to develop and present evidence that Petitioner suffered from mental illness at the time of the homicides. He alleges that such evidence was not only critical to his mitigation case, but would have also supported his self defense claim and his manslaughter lesser included offense during the guilt stage of his trial. Having already determined that Petitioner is entitled to a new sentencing proceeding, the Court reviews this claim only as it relates to the first stage of Petitioner's trial.

### 1. Ineffectiveness claim on direct appeal

On direct appeal, Petitioner alleged that his trial counsel had conducted an unreasonable and inadequate mental health investigation which led to the presentation of an objectively deficient mental health defense. During the first stage of trial, defense counsel presented no evidence that Petitioner suffered from any kind of mental illness or infirmity. During the sentencing phase, defense counsel limited evidence of Petitioner's mental state to the testimony of Wanda Draper, Ph.D., who as a developmental specialist could discuss some mitigating factors in Petitioner's background, but who could not diagnose Petitioner's

mental state. Simultaneous with his direct appeal, Petitioner applied to the OCCA for an

evidentiary hearing on his ineffectiveness claims. The application relied on affidavits of

mental health professionals and of Petitioner's family members to demonstrate to the OCCA

that Petitioner's trial counsel had readily available evidence that should have led to the

discovery that he suffered from bipolar disorder with psychotic features.

In ruling on Petitioner's direct appeal, the OCCA's engaged in a detailed analysis of

the evidence presented at trial by Dr. Draper. It also conducted the following detailed review

of the evidence submitted by Petitioner in support of his request for an evidentiary hearing:

> In Exhibit A, Dr. Ray Hand, Ph.D., testified that in January 2005
> (approximately 4 months before trial) he met with Appellant at the Oklahoma
> County Jail and administered some psychological tests. Dr. Hand did not
> diagnose Appellant as having bi-polar disorder, noting that the interpretive
> report for the MCMI–III did not show that Appellant suffered from bipolar
> disorder. He found Appellant was subject to manic episodes of an "explosive
> and hostile character." Dr. Hand also noted signs of feigning by Appellant or
> exaggerating his symptoms, i.e., a "high debasement score." Dr. Hand
> indicated more work needed to be done before he could confirm or rule out a
> diagnosis. Dr. Hand stated that he had shared his findings with defense counsel
> who told him not to assess or evaluate Appellant further. Dr. Hand stated that
> defense counsel told him he felt that in the context of this case, the evaluation
> could be a potential liability and more of a risk than a help to the defense.

> Exhibit B is a sworn affidavit from Jack Randall Price, Ph.D., who
> states that he was retained by appellate counsel to conduct a psychological and
> neuropsychological evaluation of Appellant. Dr. Price diagnosed Appellant as
> suffering from a long-standing bipolar disorder. In arriving at this diagnosis,
> Dr. Price addressed Appellant's history of significant alcohol and drug abuse;
> his discharge from the military for illegal drug use; and his status as a former
> seller of drugs. Dr. Price found Appellant's attempts to self-medicate with
> drugs and alcohol only served to exacerbate his mood swings, and "[t]he use
> of drugs and alcohol acted to disinhibit his agitated mood state, leading to
> unpredictable and aggressive behavior."

Also included are affidavits from Appellant's half-brother, Jason Jones, and cousin, Mike Ballard. (Exhibits C & D). Both men state they grew up with Appellant and were with him during the afternoon and evening of April 11, 2003, before Appellant went to the Platt residence. Their affidavits provided information about Appellant's family, his personality, his explosive temper, as well as his drug and alcohol use in the hours before the shootings. Both men state they talked with defense counsel but for various reasons were not called to testify at trial. Affidavits from Appellant's mother, Tedi J. Roberts, and his uncle, Matthew Scott Ballard (Exhibits E & F) provide further anecdotal evidence of Appellant's explosive behavior.

In a pre-trial motion hearing, defense counsel informed the court that Appellant had a history of bipolar disorder and the information might be useful to the self-defense claim. Counsel indicated he was going to rely on testimony from a jail psychiatrist (unnamed at that time) who had prescribed medication for Appellant which would not have been prescribed if Appellant did not have a mental illness. The court informed defense counsel that if an expert was called for the defense, the State would be entitled to have its own expert examine Appellant. Defense counsel was informed that if in fact the jail psychiatrist or any expert had diagnosed Appellant with a mental illness, a report needed to be prepared and turned over to State. Defense counsel informed the court he had no intention of calling Dr. Hand as a witness.

Jones, 201 P.3d at 891.

The OCCA concluded that trial counsel's decision not to present evidence that Petitioner suffered mental illness was reasonable under the circumstances. Id. at 891-92. It noted that evidence of Petitioner's mental state contained the type of "double edge" the Supreme Court has found sufficient to justify limited investigations. Id. at 892. It observed that had Petitioner's mental health been put at issue, trial counsel would have necessarily invited the State's independent mental health investigation and its cross-examination of Petitioner's witnesses. The court determined that such cross-examination would have inevitably "brought out much damaging information regarding [Petitioner's] drug use and

violent temper," and would have seriously undermined Petitioner's assertion "that he was defending himself against a crazy, 'drugged out' mob." Jones, 201 P.3d at 892. In addition, the court found that "[p]resentation of the [mental illness] evidence would not have significantly influenced the jury's appraisal of [Petitioner's] moral culpability." Id. at 893.

In light of those determinations and its review of the record, the OCCA denied Petitioner an evidentiary hearing on the ground that he had failed to satisfy Rule 3.11(B)(3)(b), Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch. 18, App. (2008), requiring that he show by clear and convincing evidence a strong possibility that defense counsel was ineffective for failing to investigate further and utilize the complained-of evidence. Jones, 201 P.3d at 893. In addition to its review under the "clear and convincing" standard of Rule 3.11, the court stated that it had reviewed the ineffectiveness of counsel claim under the standard set forth in Strickland, and had concluded that Petitioner had not shown his trial counsel's performance to be was deficient. The court found that because trial counsel's decision not to present mental health evidence bore "all the hallmarks of a strategic decision," it was reasonable. Jones, 201 P.3d at 890-93. It also found that Petitioner could not establish that he was prejudiced by counsel's conduct. Id. at 893.

Petitioner asks this Court to undertake a de novo review of his ineffectiveness of trial counsel claim on the ground that the OCCA's disposition rested on Rule 3.11's "aberrant" clear and convincing standard rather than the analysis mandated by the Supreme Court in Strickland. Petition at 32-33. This court notes that shortly before the Petition was filed, the OCCA explained the functional interplay between its Rule 3.11 and the Strickland standard.

43

In Simpson v. State of Oklahoma, the OCCA stated: "[W]hen we review and deny a request for an evidentiary hearing on a claim of ineffective assistance under the standard set forth in Rule 3.11, we necessarily make the adjudication that Appellant has not shown defense counsel to be ineffective under the more rigorous federal standard set forth in Strickland." 230 P.3d 888, 906 (Okla.Crim.App. 2010). Simpson also confirmed that when evaluating an application under Rule 3.11, the OCCA thoroughly examines the non-record evidence. Id. at 905.

Recently, the Tenth Circuit held that, given the OCCA's assurances in Simpson, as a matter of federal law, "any denial of a request for an evidentiary hearing on the issue of ineffective assistance of counsel filed pursuant to OCCA Rule 3.11 ... operates as an adjudication on the merits of the Strickland claim and is therefore entitled to deference under § 2254(d)(1)." Lott v. Trammell, 705 F.3d 1167, 1213 (10th Cir. 2013). Accordingly, the OCCA's ineffectiveness determination in this case would be entitled to AEDPA deference even had the OCCA not made explicit its finding that Petitioner had failed to meet his Strickland burden.

Petitioner next argues for this Court's de novo review of his ineffectiveness claim on the ground that the OCCA failed to examine and adjudicate his claim that trial counsel's investigation was unreasonable in light of indications of mental illness which demanded further exploration. In order "to evaluate the factual record," he asks the Court to grant him the evidentiary hearing he diligently sought from the OCCA but was denied. Petition at 32. He suggests that whether or not this Court grants such a hearing, it should review factual

record in the context of "additional insights" afforded by evidence developed post conviction. That evidence includes testimony from Petitioner's elementary school special education teacher, William Elder, that Petitioner had been bullied as a youth. It includes diagnosis and treatment evidence offered by psychiatrist, Bhushan S. Agharkarand. And it includes trial counsel James Rowan's testimony regarding "what went wrong with [Petitioner's] representation," his "affirmation that the mental health information now collected would have been valuable for presentation at trial," and his declaration that counsel's investigation into Petitioner's mental health was not limited as a tactical decision. Finally, Petitioner offers the affidavit of a trial juror testifying that the jury might not have imposed a death sentence had jurors heard evidence that Petitioner was mentally ill. Petition at 38- 39.

This Court is convinced that the OCCA did indeed rule on Petitioner's claim that counsel's investigation was unreasonably superficial. As Petitioner acknowledged in his Reply, the Supreme Court held in <u>Richter</u> that when a state court summarily rejects without discussion *all* claims raised by a defendant, including a federal claim subsequently raised in a federal habeas proceeding, the federal habeas court must presume that the federal claim was adjudicated on the merits. More recently, the Supreme Court extended that same rule to adjudications in which the state court expressly addressed *some* of the claims raised by a defendant, but not the claim later raised in a federal habeas proceeding. <u>Johnson v. Williams</u>, 133 S.Ct. 1088, 1091 (2013). Although the presumption of adjudication is rebuttable, here Petitioner cannot rebut the presumption that the OCCA adjudicated his claim. The OCCA's

opinion discusses the fact that defense counsel were advised by their mental health expert that further investigation might well lead to a diagnosis that Petitioner suffered from serious mental illness. The court determined that trial counsel's decision to forego a thorough mental health investigation was reasonable because evidence that Petitioner was mentally ill would have "opened the floodgates" to evidence harmful to Petitioner's defense. Jones, 201 P.3d at 892.

Because the OCCA reached the merits of Petitioner's ineffectiveness claim, including his claim that counsel failed to conduct a reasonable investigation, this Court's review is constrained by the deference afforded under §2254(d). *See* Richter, 562 U.S. at 99-100. Thus, in order to obtain relief, Petitioner must establish that the OCCA's adjudication" "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law," or "(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." § 2254(d). The burden placed on a habeas petitioner by § 2254(d) is a heavy one. It's weight is increased where, as here, the petitioner seeks relief from a ruling that he has failed to meet the Strickland's standard for ineffective assistance of counsel. Richter, 562 U.S. at 99-100.

In Richter, the Supreme Court set out the proper analysis in which a federal habeas court is to engage when reviewing a state court's denial of an ineffectiveness of counsel claim. It observed that the standards created by Strickland and § 2254(d) are both "highly deferential." *Id.* at 105; *see also* Lindh v. Murphy, 521 U.S. 320, 333, n. 7 (1997). When, on habeas review, the two are applied in tandem, they become "doubly" deferential. Knowles

v. Mirzayance, 556 U.S. 111, 123 (2009). Thus, the pivotal question for a federal habeas court is whether the state court's application of Strickland was unreasonable. This is fundamentally different from asking whether defense counsel's performance fell below Strickland's standard." Richter, 562 U.S. at 105.

The same year that Richter was decided, the Supreme Court also decided Cullen v. Pinholster, 131 S.Ct. 1388. Pinholster imposed still further restrictions on federal habeas courts' review of state court determinations. It held that "[i]f a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before that state court." Id. at 1400. Thus, evidence introduced for the first time in federal court generally has no bearing on § 2254(d)(1) review. The Court reasoned that:

> Section 2254(d)(1) refers, in the past tense, to a state-court adjudication that "resulted in" a decision that was contrary to, or "involved" an unreasonable application of, established law. This backward-looking language requires an examination of the state-court decision at the time it was made. It follows that the record under review is limited to the record in existence at that same time i.e., the record before the state court ... It would be contrary to that purpose to allow a petitioner to overcome an adverse state-court decision with new evidence introduced in a federal habeas court and reviewed by that court in the first instance effectively de novo.

> Id. at (citations omitted).

In light of the authority set forth above, Petitioner cannot obtain habeas relief unless he can establish that there is no reasonable argument that trial counsel satisfied Strickland's deferential standard. It is not enough to show that counsel's actions were unreasonable, the question is whether fairminded jurists could disagree as to their reasonableness. Richter, 562

47

U.S. at 101. Furthermore, under Pinholster, Petitioner must meet this demanding bar on the basis of the evidence before the OCCA at the time it made its Strickland determination.

Petitioner asserts that he has met his bar as he has established that counsel failed to perform their "affirmative duty to investigate all reasonably available mitigation evidence." Petition at 28. He contends this affirmative duty is recognized by the Supreme Court in Wiggins v. Smith, 539 U.S. at 521 (2003), Williams v. Taylor, 529 U.S. at 369, and Rompilla v. Beard, 545 U.S. 374, 381- 382, 379 (2005). All of the authority cited by Petitioner addresses counsel's duty to a capital defendant in the *penalty* phase of his trial. This is understandable as the sentencing stage "is the most critical phase of a death penalty case." Romano v. Gibson, 239 F.3d 1156, 1180 (10th Cir. 2001). "Any competent counsel knows the importance of thoroughly investigating and presenting mitigating evidence." Id. Here, however, the Court has already found that Petitioner is entitled to a new sentencing, thus, it is currently concerned only with the affect of counsel's performance on the guilt stage of his trial. None of the cases cited by Petitioner impose upon counsel a duty to undertake a thorough mental health investigation or present evidence of a defendant's mental state as part of the first stage defense. Furthermore, in Pinholster, the Supreme Court rejected the notion of a broadly applicable duty to investigate in all circumstances. It held that under Strickland, "specific guidelines are not appropriate," and "[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions ...." Pinholster, 131 S.Ct. at 1406 (quoting Strickland, 466 U.S. at 688–689).

48

Petitioner's assertion that the OCCA was objectively unreasonable in failing to recognize trial counsel's "affirmative duty to investigate" is unsustainable at least with regard to the guilt phase of his trial. Absent any specific Supreme Court authority defining the parameters of an appropriate investigation in circumstances similar to Petitioner's, the OCCA properly applied Strickland to Petitioner's claim. Pursuant to Strickland, in any ineffectiveness case, "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." Id. at 691. Applying the deference demanded by Strickland, the OCCA concluded that counsel made a reasonable decision to limit the inquiry into Petitioner's mental health. It noted that counsel had investigated Petitioner's family and upbringing, and had employed Dr. Draper to introduce mitigating evidence from his background without opening the door to more incendiary evidence.

This Court's misgivings regarding counsel's performance do not enable it to grant Petitioner relief. Given the generality of the rule of reasonableness articulated in Strickland, the OCCA had considerable latitude in applying that rule to the facts of Petitioner's case. See Richter 562 U.S. at 101-102. To grant relief, this Court must find that in its application of Strickland, the OCCA strayed beyond the wide latitude granted it and arrived at a conclusion that was not merely incorrect, but objectively unreasonable. A state court decision cannot be considered objectively unreasonable "so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Frost v. Pryor, 749 F.3d 1212, 1225 (10th Cir. 2014) (quoting Richter, 562 U.S. at 101). While Petitioner protests that the

49

fairminded jurist test "cannot, of course, be a subjective test that requires all judges to agree," (Reply at 13, fn. 7), the most recent Supreme Court pronouncements on the subject make clear that is precisely what the test requires. As the Tenth Circuit explained in Frost:

> The Court's "fairminded jurists" test ... serves as a proxy for "unreasonable application." It is designed to help federal courts reviewing § 2254 habeas motions to determine whether a state court decision that would be incorrect under de novo review is also unreasonable. Under the test, if all fairminded jurists would agree the state court decision was incorrect, then it was unreasonable and the habeas corpus writ should be granted. If, however, some fairminded jurists could possibly agree with the state court decision, then it was not unreasonable and the writ should be denied.

Frost, 749 F.3d at 1225-26 (citations omitted).

This Court has no doubt that, at least with regard to the guilt phase of Petitioner's trial, fairminded jurists could agree with the OCCA's determination that after performing an investigation adequate to apprise them that Petitioner quite possibly suffered from serious mental illness or impairment, trial counsel reasonably decided that pursuit of additional mental health evidence would not aid in the development of Petitioner's first stage defense. In light of the evidence before the OCCA on direct appeal, its determination that trial counsel were not deficient under Strickland cannot be considered contrary to, or an unreasonable application of federal law.

As for the OCCA's prejudice analysis, it too, of course, is subject to the fairminded jurist test. In light of the evidence before the OCCA on direct appeal, it is possible that fairminded jurists could agree that evidence of Petitioner's mental health would not have

affected the jury's guilt verdicts. The Court must defer to the OCCA's determination on direct appeal that Petitioner's claim did not entitle him to a new trial of his guilt.

## 2. Ineffectiveness claims on application for post-conviction relief

Following denial of his direct appeal, Petitioner filed his Original Application for Post-Conviction Relief and Motion for Evidentiary Hearing with the OCCA in accordance with 22 Okla. Stat. Supp. § 1089. Among the claims he urged was a claim that trial and appellate counsel were ineffective for having failed to fully investigate his background and present William Elder, Petitioner's former special education teacher who could have provided evidence that Petitioner was bullied by classmates.

The OCCA rejected the post-conviction claim for ineffective assistance of trial counsel. It held that to the extent the claim raised issues addressed on direct appeal, it was barred by res judicata. To the extent Petitioner articulated a different claim, said claim was waived because it could have been presented on direct appeal but was not. The court also rejected the notion that the claim was one which, because it required fact-finding outside the direct appeal record, could be brought for the first time in a post-conviction proceeding pursuant to 22 Okla. Stat. § 1089(D)(4)(b)(1). It found that all of the facts upon which Petitioner relied were available at the time of his direct appeal. Contrary to Petitioner's assertion that the OCCA's post conviction disposition was "ambiguous," (Petition at 39), it appears clear to this Court that the OCCA held post-conviction review of the claim to be procedurally barred. Jones, No. PCD-2005-822, slip op. at 7.

Petitioner attempted unsuccessfully to demonstrate to the OCCA that his default was excused by the ineffective assistance of his appellate counsel. He sought a hearing to develop evidence concerning Mr. Elder. He argued that competent appellate counsel would have developed and introduced such evidence on direct appeal to demonstrate trial counsel's ineffectiveness. Although the court did not grant Petitioner his requested evidentiary hearing, it discussed in detail the evidence that would have been presented by Mr. Elder. The court acknowledged that evidence of Petitioner's early emotional disturbance and his history of having suffered at the hands of schoolyard bullies provided a snapshot of his school years. It concluded, however, that the relevance of such evidence to the night of the crime was marginal. Jones, No. PCD-2005-822, slip op. at p. 8. The court determined that appellate counsel "appropriately sorted through potential claims of error and raised only those with the best chance for relief." Id. Because consideration of Mr. Elder's testimony would not have led the jury to a verdict different from the one it rendered, appellate counsel was not ineffective for omitting it as a ground for relief. Id. The OCCA, therefore, refused to excuse Petitioner's default.

A state court's application of procedural bar will bar federal review if the state procedural rule is adequate to support the judgment and independent from federal law. *See* Clayton v. Gibson, 199 F.3d 1162, 1170–71 (10th Cir.1999). These dual requirements seek to ensure state rules are not employed to defeat federal court review of constitutional rights. Petitioner has offered nothing to demonstrate that the procedural bar applied by the OCCA lacked independence or adequacy. He argues, however, that even if his claim was defaulted,

the OCCA was objectively unreasonable in failing to excuse the default for cause. Because the cause upon which he relies is his appellate counsel's alleged inadequacy, Petitioner must meet the same doubly deferential Strickland standard that thwarted his ineffectiveness of trial counsel claim. *See* Richter, 562 U.S. at 105. He must do so on the basis of the evidence the OCCA had before it when it adjudicated the application for post-conviction relief. Pinholster, 131 S.Ct. at 1400. The impediments to relief here are substantial and Petitioner has failed to overcome them. Certainly, fairminded jurists could agree with the OCCA's conclusion that "[i]n light of the evidence of the crime, there is no reasonable probability that had the jury known of Petitioner's conduct in elementary and middle school that the outcome of the trial would have been different." Jones, No. PCD-2005-822, slip op. at p. 8. This Court is, therefore, bound by that determination and must defer to the OCCA's conclusion that appellate counsel was not ineffective in declining to raise the issue on direct appeal. Federal habeas review of Petitioner's post-conviction claim is barred.

### 3. Request for evidentiary hearing or order holding the case in abeyance

As discussed in conjunction with his ineffectiveness of trial counsel claim, Petitioner requested that this Court grant him an evidentiary hearing to "to evaluate the factual record." Petition at 32; see also motion (docket entry no. 26). He seeks to further develop trial counsel James Rowan's testimony regarding his and his co-counsel's deficiencies in representing Petitioner at trial, as well as a juror's statement that he would have declined to impose a death sentence had he heard evidence that Petitioner suffered from a mental illness or

53

impairment. By order entered September 29, 2011, Chief Judge Vicki Miles-LaGrange denied Petitioner's motion, but left open the possibility that the motion might be revisited as the Court's work on the habeas Petition progressed. Because the Court is precluded from considering evidence unavailable to the OCCA, the evidence Petitioner seeks to develop could not be used in support of the ineffectiveness claim here at issue. Moreover, even were the Court able to consider it, the evidence could establish, at most, that the OCCA's conclusions with regard to the first stage of trial were incorrect, not that they were unreasonable. There is, therefore, no ground upon which to grant Petitioner his requested hearing.

Likewise, there is no ground upon which to hold the Petition in abeyance. Respondent argues that Petitioner's habeas evidence so alters his ineffectiveness claims as to cast them in a new light, rendering them unexhausted and procedurally barred. Response at 36. Petitioner, however, insists that he merely offers additional "bits of evidence" supportive of his exhausted claims. Petition at 41. The Court agree with Petitioner that the additional evidence merely supports his already exhausted claim. There is, therefore, no ground upon which to hold the case in abeyance pending resolution of a second post-conviction application with the OCCA. Pursuant to Rhines v. Weber, federal district courts have the discretion to stay mixed habeas petitions – petitions containing both exhausted and unexhausted claims – in only those limited circumstances where a stay is not inconsistent with the timeliness concerns reflected in the AEDPA. 544 U.S. 269, 277 (2005). The Court in Rhines held that a "stay and abeyance" of a mixed habeas petition is appropriate only if

(1) the petitioner had "good cause" for failing to exhaust the claims in state court, (2) the unexhausted claims are potentially meritorious, and (3) "there is no indication that the petitioner engaged in intentionally dilatory litigation tactics." Id. at 277–78.

Petitioner has not presented this Court with a "mixed petition," that is, one containing both exhausted and unexhausted claims. His habeas petition presents only claims that were exhausted by presentation to the state court in his direct appeal and his proceeding for post-conviction relief. As Rhines does not apply to the exhausted claims, it affords no basis to stay this case. Petitioner's Ground Four does not entitle him to a new trial of his guilt.

### E.    Ground Five: Counsel's ineffectiveness in the preparation and presentation of expert witness Tom Bevel

In his fifth ground for relief, Petitioner claims he was deprived of his constitutional right to assistance of counsel because his trial counsel were ineffective in their preparation and presentation of witness Tom Bevel, an expert in crime scene reconstruction. He further claims that this ineffectiveness was attributable to a conflict of interest that not only influenced counsel to minimize Mr. Bevel's preparation in an attempt to save expense, but also encouraged counsel to put the inadequately prepared witness on the stand so as to avoid incurring personal responsibility for his fees. Petitioner raised this claim for the first time in his application for post-conviction relief. The OCCA ruled the claim to have been waived. It found that all facts supporting Petitioner's claim were available at the time of direct appeal and that, therefore, failure to urge the claim at that time constituted a default. Jones, No. PCD-2005-822, slip op. at 9. Petitioner attempted to show that the default was excused

because it was caused by his appellate counsel's ineffectiveness in failing to urge a plainly meritorious claim, and that he suffered prejudice as a result. The OCCA rejected Petitioner's showing finding that appellate counsel made a strategic decision not to raise on direct appeal a ground that would have certainly been denied. Jones, No. PCD-2005-822, slip op. at 10.

Petitioner urges this Court to undertake de novo review of his claim for a number of alternative reasons. He contends first that the state court's procedural default is unsustainable as the ground for default lacked independence and adequacy. Petitioner makes little effort to support that contention, and support would be difficult to marshal. "The Oklahoma requirement that a claim of ineffective assistance of trial counsel be raised on direct appeal is an adequate ground for procedural default if (1) the defendant's counsel on direct appeal is different from trial counsel and (2) the claims can be resolved on the trial record alone." Welch v. Workman, 639 F.3d. at 1012. Petitioner disputes neither that he had different counsel on appeal nor that the claim could have been resolved on the trial record alone. The OCCA's application of the procedural default was sound.

Petitioner next contends that even if his claim was subject to Oklahoma's procedural bar, the OCCA unreasonably refused to excuse his default. Petitioner sought to overcome the procedural bar by demonstrating to the OCCA that his default was caused by appellate counsel's ineffectiveness in failing to raise on direct appeal trial counsel's inadequate preparation of Mr. Bevel and the conflict of interest which simultaneously discouraged trial counsel from investing time in Mr. Bevel's preparation time and encouraged the presentation of an unprepared witness. The state court rejected Petitioner's claim that appellate counsel

performed ineffectively. It prefaced it's determination with a recitation that "the mere failure to raise an issue on appeal, whether meritorious or not, is not grounds for a finding of ineffectiveness." Jones, No. PCD-2005-822, slip op. at 9 (citing Mitchell v. State, 934 P.2d 346, 350-51 (Okla. Crim. App. 1997) (failure to raise an "arguably meritorious claim" does not, in itself, constitute deficient performance)). This Court notes that the Tenth Circuit has repeatedly held that the "regardless of the merits" standard fails to pass constitutional muster. Most recently, in Milton v. Miller, 744 F.3d 660, 669-70 (10th Circuit 2014), the Circuit Court denounced the "regardless of the merits" standard for its impermissible truncation of the first prong of Strickland's test.

As Strickland unquestionably supplies the standard for evaluating counsel's purported ineffectiveness, any departure from its requirements constitutes an objectively unreasonable application of Supreme Court Authority. Cargle, 317 F.3d at 1205 (no test that ignores the merits of the claim omitted by the allegedly ineffective appellate counsel can comport with federal law). Thus, had the OCCA ended its analysis without inquiring into the merits of his omitted claims, Petitioner would be entitled to this Court's de novo review of his appellate counsel's effectiveness. The OCCA did not end its analysis with the repudiated "regardless of the merits" standard, however. It examined the record and observed that Mr. Bevel:

> had sufficient "necessary information" to testify in support of Petitioner's claim of self-defense. Based upon a review of police reports, the physical evidence, statements of the persons involved, and Petitioner's physical condition Mr. Bevel answered five specific questions posed by defense counsel: whether there was evidence of a physical alteration or struggle prior to the shooting; the distance from the end of the muzzle to the wounds of each victim; the approximate body position of each victim to the weapon at the time

57

of the gunshots; where each victim moved to immediately after begin shot and the shooter's position during the shooting. That portions of Mr. Bevel's testimony on cross-examination may have been conflicting based upon additional information brought to his attention during trial, does not make counsel ineffective for calling him a witness.

Jones, No. PCD-2005-822, slip op. at 9-10.

The OCCA concluded that trial counsel's decision to call Mr Bevel was "clearly a matter of trial strategy which is not at basis for a finding of ineffectiveness." Id. at p. 10. The state court also rejected Petitioner's conflict of interest claim, stating: "[u]pon our review, we find the claim is not supported in the law or the record." Unconvinced by both Petitioner's legal authority and his factual case, the OCCA ruled that because the ineffectiveness of trial counsel claim lacked merit, it would have been denied had appellate counsel raised it on direct appeal. Petitioner, therefore, could demonstrate neither cause for his default, nor prejudice flowing from such cause.

Petitioner contends the OCCA's Strickland analysis was unreasonable. As discussed at length above, Strickland required the OCCA to make "every effort ... to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Id. at 689. Applying the second layer of deference mandated on habeas review, this Court cannot grant relief unless it finds that no reasonable jurist could concur with the the OCCA's conclusion that appellate counsel strategically omitted from Petitioner's direct appeal meritless claims relating to trial counsel's presentation of Tom Bevel.

With regard to Petitioner's claim that Mr. Bevel was not provided information necessary to support his self-defense case, the OCCA reviewed the record and concluded:

> "Mr. Bevel's direct examination shows he had sufficient 'necessary information' to testify in support of Petitioner's claim of self-defense. Based upon a review of police reports, the physical evidence, statements of the persons involved, and Petitioner's physical condition Mr. Bevel answered five specific questions posed by defense counsel: whether there was evidence of a physical altercation or struggle prior to the shooting; the distance from the end of the muzzle to the wounds of each victim; the approximate body position of each victim to the weapon at the time of the gunshots; where each victim moved immediately after being shot and the shooter's position during the shooting. That portions of Mr. Bevel's testimony on cross-examination may have ben conflicting based upon additional information brought to his attention during trial, does not make counsel ineffective for calling him as a witness. As Mr. Bevel stated on re-direct, even with the additional information provided to him on cross-examination, Petitioner's claim of self-defense was still plausible. Defense counsel's decision to call Mr. Bevel as a witness was clearly a matter of trial strategy which is not a basis for a finding [of] ineffectiveness.

Jones, No. PCD-2005-822, slip op. at 9-10 (citations omitted).

Petitioner has neither rebutted by clear and convincing evidence the state court's factual determinations, nor has he shown, as required by Strickland, that no reasonable jurist could agree with the conclusions drawn therefrom by the court. Furthermore, Petitioner has presented no evidence that would support his allegation that Mr. Bevel was biased in favor of the State. In fact, this Court's review of the record reveals defense counsel were "ecstatic" that Mr. Bevel would "make special room" for Petitioner's case in consideration of his "long history" with counsel James T. Rowan." M. Tr. 2/11/2005 at 11. The OCCA's conclusion that counsel's selection, preparation and presentation of Mr. Bevel constituted matters of trial strategy and not any deficiency of performance finds considerable support in the record.

Thus, its determination that Petitioner "failed to show he was prejudiced by appellate counsel's failure to challenge Mr. Bevel's testimony on appeal" is neither contrary to nor an unreasonable application of clearly established Supreme Court authority.

Petitioner argues that failure to meet the Strickland test is not fatal to his claim because counsel were operating under a conflict of interest and that such a conflict alters the test for ineffectiveness. *See* Strickland at 692 (holding that where a defendant demonstrates that an actual conflict of interest adversely affected his lawyer's performance, prejudice is presumed). He submits that the trial court instituted an arrangement whereby counsel would become personally responsible for Mr. Bevel's fee if he did not testify at trial. Petitioner argues that this arrangement created an actual conflict of interest that adversely affected his defense.

Petitioner's mother paid to privately retain defense counsel. She did not, however, have sufficient funds to pay for expert witnesses. O.R. Vol. I at pp.118-19. On July 30, 2004, the defense filed an application with the trial judge requesting funds for experts and an investigator. Id. at 115-17. Following a hearing on the matter, the judge declared Petitioner indigent and authorized up to $5,000 in court funds to pay for the retention of a psychologist and a mitigation expert. O.R. Vol. II at pp. 257-58. On February 8, 2005, one of Petitioner's attorneys, Mr. Rowan, filed a second application seeking an additional $2,000 for the retention of Mr. Bevel. O.R. Vol. II at 233-34. The matter was heard on February 11, 2005. The trial court expressed frustration that counsel seemed unable to account for all of the $5,000 already allotted for experts and suggested that since the defense had decided not

to put the psychologist on the stand, that some of the funds allocated for his testimony could

be used to offset the costs of retaining Mr. Bevel.  The court also expressed great reticence

to pay additional expert fees for a privately represented defendant:

> THE COURT:     The other question that I have is that if you feel sincerely about
> Mr. Bevel, why are you not paying for him?
>
> MR. ROWAN:     I don't have money for him.
>
> THE COURT:     Yeah, you do.  You've been paid.  You've been retained in this
> case.  You chose to take a capital case.  And I told you, when I
> gave you $5,000, to not come back to this court and ask for
> more public funds, that you all were privately retained.  It is
> unusual, as you know, to privately retain lawyers in capital
> cases.  But that does not mean that I just continue to hand out
> money to you because you now want to hire another expert who
> may or may not be of any assistance to you.

M. Tr. 2/11/2005 at 6-7.

Mr. Rowan argued that Petitioner's case "certainly would be enhanced if the crime

scene reconstructionist were to say that everything that [Petitioner] says is not inconsistent

with the physical evidence." Id. at 9.  The trial court concluded:

> THE COURT:     ... Okay.  What I think would be fair is for you to pay him.  And
> if you call him as an expert witness, then the court fund will
> reimburse the $2,000 and I will pay him.  If you feel strongly, as
> you must, because you're requesting a continuance of the trial
> that Mr. Bevel would be of great assistance to you, then that's
> – I think that's fair.

> I am, frankly, not happy with expending court funds on a privately represented defendant. I don't think that's appropriate.
>
> So you feel strongly enough about Mr. Bevel, you can retain him, and then if you end up using him in court then I , the court fund, will pay the $2000 to Mr. Bevel. If you end up not using him and the state uses him, then I assume they will pay for him also.

MR. ROWAN:     That's fair, Your Honor.

Id. at 46-47.

Following the trial, the court authorized the disbursement of $3,025 to pay for Mr. Bevel's services. O.R. Vol. IV at 745-50. Petitioner claims his counsel had an inappropriate incentive to put Mr. Bevel on the stand regardless how his testimony might impact the defense. This, he argues, amounts to an actual conflict of interest. An actual conflict of interest is a conflict that affected counsel's performance "as opposed to a mere theoretical division of loyalties." Mickens v. Taylor, 535 U.S. 162, 171(2002). A defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief. Cuyler v. Sullivan, 446 U.S. 335, 349-50 (1980).

The OCCA rejected Petitioner's conflict claim. It stated:

> As for Petitioner's claim that defense counsel had a financial obligation to call Mr. Bevel as a witness, no supporting legal authority has been offered. Upon our review, we find the claim is not supported in the law or the record. Therefore, we find Petitioner's claim of ineffective assistance based on a conflict of interest unavailing and such a claim would have been denied on direct appeal.

<u>Jones</u>, No. PCD-2005-822, slip op. at 10.

Petitioner argues that the OCCA's decision is unreasonable and contrary to established Supreme Court authority as set forth in <u>Strickland</u>, <u>Sullivan</u>, and <u>Wood v. Georgia</u>, 450 U.S. 261 (1981). As shown below, none of those cases holds that an actual conflict of interest arises whenever a lawyer is required to pay for expert assistance from his fee.

<u>Strickland</u> provides little support for Petitioner's position. In <u>Strickland</u>, the Supreme Court did not adjudicate a claim that counsel was rendered ineffective due to a conflict of interest. Rather, in promulgating the standard applicable to ineffectiveness claims generally, the Court discussed how that standard will apply when an ineffectiveness claim is based on counsel's alleged conflict of interest.

<u>Sullivan</u> is clearly distinguishable from Petitioner's situation as it addresses multiple representation. In <u>Sullivan</u>, two privately-retained lawyers represented three defendants charged with the same murders; one was convicted and the other two were later acquitted. The first defendant, who made no objection to the multiple representation at trial, claimed his lawyers' conflict of interest deprived him of his Sixth Amendment right to effective assistance of counsel. The Supreme Court held that to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance. Thus, a defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief.

Finally, Wood, like Sullivan, is easily distinguishable from Petitioner's claim. In Wood, employees of "adult" enterprise were represented by an attorney paid by their employer. Following their convictions for distributing obscene materials, the employees were granted probation conditioned on their payment of $500 per month in fines. The fines went unpaid and probation was revoked. The employees contended that their employer was obligated to pay the fines but had refused. They sought modification of their probation conditions on the ground that they were financially unable to pay. The request was denied and the employees were ordered to serve out their jail sentences.

The Supreme Court granted a writ of certiorari to decide whether it is constitutional under the Equal Protection Clause to imprison a probationer solely because of his inability to make installment payments on fines. Before reaching the Equal Protection question, the Court determined that:

> [s]ince it was this decision by the employer that placed petitioners in their present predicament, and since their counsel has acted as the agent of the employer and has been paid by the employer, the risk of conflict of interest in this situation is evident. The fact that the employer chose to refuse payment of these fines, even as it paid other fines and paid the sums necessary to keep petitioners free on bond in this case, suggests the possibility that it was seeking – in its own interest – a resolution of the equal protection claim raised here. If offenders cannot be jailed for failure to pay fines that are beyond their own means, then this operator of "adult" establishments may escape the burden of paying the fines imposed on its employees when they arrested for conducting its business. To obtain such a ruling, however, it was necessary for petitioners to receive fines that were beyond their own means and then risk jail by failing to pay.

Wood, 450 U.S. at 267 (footnotes omitted). The Court's concern clearly arose from the unique facts encountered by purveyors of adult entertainment. The Court never suggested

that a conflict of interest arises whenever a third party pays a criminal defendant's attorneys' fees.

Petitioner has failed to proffer clear Supreme Court authority establishing that a lawyer's responsibility for expert fees places his interests in actual conflict with those of the criminal defendant he represents. Additionally, lower federal courts have rejected conflict claims arising from similar fee arrangements. For example, in Williams v. Calderon, 52 F.3d 1465 (9th Cir.1995), the petitioner had paid his lawyer a flat fee from which expert services were to be compensated. The petitioner argued that "the fact that payment for any investigation or psychiatric services could have come from counsel's pocket forced counsel to choose between [the petitioner's] interests and his own." Id. at 1473. The Ninth Circuit held that any conflict inherent in the fee arrangement fell short of an actual conflict as defined in Cuyler. It concluded that "[a]ll [Petitioner] alleges is the same theoretical conflict that exists between an attorney's personal fisc and his client's interests in any pro bono or underfunded appointment case. Such arrangements, without more, do not require Sixth Amendment scrutiny." Id.; see also Bonin v. Calderon, 59 F.3d 815, 827 (9th Cir.1995) (no actual conflict based on counsel's substitution as retained counsel depriving defendant of state-funded investigators and expert witnesses and requiring attorney to pay for any investigative experts out of his own pocket); U.S. v. Stitt, 552 F.3d 345, 350–51 (4th Cir .2008) (petitioner failed to show fee arrangement had adverse effect on counsel's performance where there was no showing that hiring out-of-state investigation was plausible, objectively reasonable strategy); Hand v. Secretary, Dept. Of Corrections, 305 Fed.Appx.

547, 550 (11th Cir. 2008) (state court did not unreasonably apply clearly established federal law by finding no prejudice where defense counsel represented defendant on a fixed fee with all costs and expenses to be paid by counsel).

Not only do the foregoing circuit court cases evince a lack of recognition of an actual conflict of interest in a case such as Petitioner's, the Supreme Court has itself suggested that Sullivan may not apply outside the scope of multiple concurrent representation. *See* Mickens, 535 U.S. at 175-76. In Mickens, the Court stressed that cases of multiple concurrent representation present a high probability of difficult-to-prove prejudice which is simply not present in all attorney conflicts. Id. Whether Sullivan should be extended beyond the multiple concurrent representation context, therefore, "remains, as far as the jurisprudence of [the Supreme] Court is concerned, an open question." Id. at 176.

There does not appear to be any Supreme Court authority establishing that an actual conflict of interest arises whenever a lawyer is required to pay for expert assistance from his fee. Thus, the OCCA reasonably rejected Petitioner's claim that appellate counsel was ineffective for failing to raise trial counsel's alleged conflict of interest as a ground for appeal. Because Petitioner has failed to overcome the procedural default recognized by the OCCA, and because he has not made any colorable showing of factual innocence which could establish that this Court's failure to review the omitted claim will result in a fundamental miscarriage of justice, this Court is barred from considering the claims relating to the preparation and presentation of witness Tom Bevel. *See* Sherrill v. Hargett, 184 F.3d

1172, 1174 (10th Cir. 1999); *see also* <u>Demarest v. Price</u>, 130 F.3d 922, 941 (10 Cir. 1997).

Relief on this ground is, therefore, denied.

### F. Ground Eleven: Failure to Remove Unqualified Prospective Jurors

Petitioner outlines his eleventh ground for relief as follows:

During the course of voir dire, the trial court removed nine prospective jurors for cause despite an insufficient record to justify removal and failed to excuse two biased jurors for cause, requiring the use of peremptory challenges needed to strike another problem juror. Also, counsel shared responsibility in that they failed to request removal of one of the jurors for cause.

Petition at 83. The claim is exhausted as it was raised on direct appeal to the OCCA which reviewed it on the merits and denied relief.

Because it exclusively affects the penalty phase of his trial, the Court refrains from addressing Petitioner's allegation that the trial court improperly removed, sua sponte, nine jurors who merely voiced generalized objections to or conscientious or religious reservations regarding the imposition of the death penalty. Instead, the Court restricts its review to Petitioner's claim that he is entitled to relief on the ground that despite their bias against his defense, neither Prospective Juror James nor Prospective Juror Phillips were removed for cause and that, therefore, he was forced to use two peremptory challenges to remove them. The OCCA determined that neither juror exhibited actual bias and that neither the trial court's failure to remove them for cause nor its refusal to grant Petitioner additional peremptory challenges was error.

During the voir dire of the potential jurors, Prospective Juror James stated that she had something she had to say. Tr. Vol. III at 14. She noted that the defense had asserted that self

67

defense was applicable to the case, and she expressed serious reservations about her ability

to consider such a defense where the defendant admitted shooting five people. Tr. Vol. III

at 16. The trial court adjourned to chambers with counsel and Prospective Juror James. The

court explained to the potential juror that the defense would present its evidence and then,

if the court allowed the jury to consider the defense, it would receive instruction as to the

applicable law which all jurors would have to follow. The court asked the potential juror if

she was "open to listening to the evidence and then looking at the law that I give you and

setting aside what you think may be self-defense and looking at the law and then decide

whether the actions are self-defense or not." Tr. Vol. 3 at 18. The juror answered

affirmatively, but said she wasn't sure she was "on a level playing field" with respect to the

self-defense assertion. Id. The court and counsel continued to probe the juror's attitudes,

and she continued to affirm that despite her questions and reservations with regard to what

she believed she understood about self defense, she was confident she could listen to the

evidence and apply the law according to the instructions. Tr. Vol. III at 18-29. Defense

counsel asked that the juror be excused for cause and the trial court refused, finding

"...bottom line, she can fairly evaluate the evidence and fairly use the court's instructions."

Id. at 31.

On direct appeal, the OCCA found the trial court did not abuse its discretion in

denying Petitioner's challenge for cause with respect to Prospective Juror James. It stated:

Contrary to Appellant's claim, [Prospective Juror James] was not 'incessantly
harangued' by the trial court into saying she could not be a fair juror.
[Prospective Juror James'] desire to inform the court of her concerns

68

necessitated a mor extensive voir dire than with certain other jurors. However, we do not find the court improperly persuaded [Prospective Juror James] into saying she could be a fair juror. Given her responses throughout voir dire, we are left with the impression that if [Prospective Juror James] felt she could not be a fair juror, she would have said so. Therefore, we are left with judging the credibility of [Prospective Juror James'] promises to be fair and impartial – and that credibility choice is, of course, one which the trial court is much better suited to make. We find the trial court did not abuse its discretion in refusing to strike [Prospective Juror James] for cause as she did not exhibit any actual bias.

Jones, 201 P.3d at 879. As the State points out, the OCCA's determination is a factual one and is entitled to a presumption of correctness. Patton v. Yount, 467 U.S. 1025, 1036 (1984); Gonzales v. Thomas, 99 F.3d 978, 986 (10th Cir. 1996). As Petitioner has proffered no clear and convincing evidence that Prospective Juror James harbored actual bias, this Court finds that the OCCA's refusal to assign error is neither contrary to nor an unreasonable application of federal law.

Unlike his objection to Prospective Juror James, Petitioner's objection to Prospective Juror Phillips did not arise from any expressed discomfort with the defense theory of the case. Rather, Petitioner argues that Prospective Juror Phillips should have been removed for cause because of his connection to the State. Prospective Juror Phillips was an active duty field supervisor with the Oklahoma City Police Department which was the law enforcement agency responsible for investigating his case. Prospective Juror Phillips stated that he knew some of the officers on the State's witness list and that he, in fact, directly supervised at least one of them. Tr. Vol. I at 39-41. He was also acquainted with one of the prosecutors and had

gone on a date with her more than twenty years prior. Prospective Juror Phillips was neither

excused, sua sponte, by the court nor challenged for cause by the defense.

The OCCA recognized the juror's ties with the prosecution, but accepted his

assertions that there was nothing in his relationship with the prosecutor or police officers

which would prevent him from being a fair and impartial juror.

> Under questioning by the prosecutor, J.L.P. said that people he had worked
> with had told him he was one of the fairest people they had dealt with. He said
> police officers were witnesses just like any other witnesses and they had to
> prove their credibility; while he expected a police officer's integrity to be
> above reproach, that did not mean they were going to be any more honest than
> any other citizen or witness on the stand; he could listen to all of the evidence
> and if the State did not meet all of the elements, he would not hesitate to return
> a verdict of not guilty. In terms of punishment, he said he could listen to the
> evidence, follow the law and consider all three punishments if so instructed.
> Under questioning by the defense, J.L.P. said he had never been a homicide
> detective; he could listen to the evidence and could consider all three possible
> punishments.

Jones, 201 P.3d at 880. The OCCA concluded that despite his ties to the State,

Prospective Juror Phillips did not exhibit actual bias. He consistently maintained that he

could set aside his connection to certain parties and render a verdict based on the law and

evidence. Id.

Petitioner has proffered nothing by way of clear and convincing evidence of bias to

overcome the presumption of correctness afforded the state court's finding that Prospective

Juror Phillips displayed no actual bias. *See* Gonzales, 99 F.3d at 986. Nonetheless, he

maintains that his constitutional rights were violated when the trial court's refused to grant

him an additional peremptory challenge to compensate for his use of peremptory challenges

to remove Prospective Jurors Phillips and James. Certainly if, as the OCCA found, neither Juror James nor Juror Phillips was biased, then Petitioner's argument is meritless. But even where a biased juror is removed using a peremptory challenge, the Supreme Court has ruled that loss of that peremptory challenge does not constitute a constitutional violation if the jury that ultimately sits is impartial. It held:

> [W]e reject the notion that the loss of a peremptory challenge constitutes a violation of the constitutional right to an impartial jury. We have long recognized that peremptory challenges are not of constitutional dimension. They are a means to achieve the end of an impartial jury. So long as the jury that sits is impartial, the fact that the defendant had to us a peremptory challenge to achieve that result does not mean that the Sixth Amendment was violated.

Ross v. Oklahoma, 487 U.S. 81, 88 (1988) (citations omitted); Rivera v. Illinois, 546 U.S. 148, 157-58 (2009).

Petitioner argues that the jury actually impaneled for his trial was not impartial. He relies on Ross for the proposition that where the defense has been forced to use peremptory strikes to remove jurors who should have been stricken for cause, the Constitution is violated if a juror who actually sat was biased or if the defense was deprived of an entitlement under state law. Petition at 90. Petitioner asserts that one of the empaneled jurors, Juror Wright, was biased and that he would have used an additional peremptory challenge to strike that juror from the panel. Petitioner's evidence of Juror Wright's bias is minimal at best. Petitioner states that Juror Wright "was vocal in his support of the death penalty," that he expressed a "lack of interest in any explanation of [Petitioner's] life," and that he was a

neighbor of one of his fellow jurors. Petition at 90. The OCCA found that Petitioner failed to establish that Juror Wright was biased. It found:

> [Petitioner] has not pointed to a juror whose presence on the jury prevented him from having a fair trial. The record shows that [Juror Wright] was a sophomore in college and was the neighbor of another juror. There was nothing in his *voir dire* which would render him an undesirable juror.

Jones at 880.

Petitioner claims that the OCCA's assessment was unreasonably wrong because it "summarily and unreasonably" dismissed Petitioner's assertions that Juror Wright "neither valued details of [Petitioner's] life to aid in the mitigation of his case nor kept silent as to his support of the death penalty." Petition at 91. This Court finds that the OCCA indicated that it considered all the grounds upon which Petitioner based his argument that Juror Wright was biased and concluded that no actual bias was demonstrated. That finding is presumptively correct and Petitioner has offered no clear and convincing evidence of bias to overcome the presumption.

Petitioner next argues that even should this Court fail to find that Juror Wright was biased, he is nonetheless entitled to relief because he was entitled to an additional peremptory challenge under Oklahoma law. He asserts that Rojem v. State, 130 P.3d 287, 295 (Okla. Crim. App. 2006) requires that the defense be provided an additional peremptory challenge where the defense used one or more of its nine challenges to remove a juror who should have been removed for cause and is then left with a juror "unacceptable" to the defense. In Rojem, the OCCA held that an appellant was "denied a statutory right granted under

Oklahoma law when the trial court refused to dismiss three jurors for cause, resulting in prejudice when he was forced, over objection, to keep an unacceptable juror." Id. at 296. The OCCA notes that although an "unacceptable" a juror need not be so biased as to support his removal for cause, he must be more than merely undesirable to the defense. Id. at 295 n. 10. Rojem does not represent new law. In fact, Oklahoma cases pre-dating the Supreme Court's holding in Ross, defined "unacceptable" juror even more liberally than Rojem, e.g., Thompson v. State, 519 P.2d 538, 541 (Okla. Crim. App. 1974); Cook v. State, 650 P.2d 863, 868 (Okla. Crim. App. 1982). Despite Oklahoma precedent granting relief where a defendant was forced to retain an "undesirable" juror, however, the Supreme Court concluded in Ross that the Constitution is implicated only where a seated juror exhibited actual bias. Petitioner's assertion that the Constitution is violated where an impartial but "unacceptable" juror is empaneled is at odds with federal law as expressed both in Ross and in the Tenth Circuit's application of Supreme Court authority to petitions filed by Oklahoma prisoners. See Sallahdin v. Gibson, 275 F.3d 1211(10th Cir. 2002) (denying relief where petitioner claimed he was forced to use peremptory challenge to remove biased juror, but failed to show the jurors who sat were not fair and impartial); see also Wright v. Jones, 359 Fed.Appx. 49 (10th Cir. 2010). Furthermore, even if Rojem applied here, it would not offer Petitioner relief. The OCCA clearly found that Petitioner had failed to establish that Juror Wright met even a reduced definition of "unacceptability." Petitioner has not rebutted the OCCA's presumptively correct finding of fact. Having carefully reviewed the record, the

Court concludes that the OCCA's denial of relief was neither contrary to nor an unreasonable application of clearly established Supreme Court authority.

Finally, Petitioner alleges that his trial counsel was ineffective in failing to request that Prospective Juror Phillips be removed for cause. On direct appeal, the OCCA rejected this ground for relief. The court found counsel were not ineffective because Prospective Juror Phillips was neither statutorily unqualified, nor did he exhibit any actual bias such as would support his removal for cause. In addition, the state court concluded that Petitioner suffered no prejudice as required for relief under <u>Strickland</u> because the jury that actually heard his case was impartial. Petitioner has failed to demonstrate that the OCCA's application of <u>Strickland</u> was unreasonable. His Ground Eleven raises no claim that would entitle him to a new trial of his guilt.

### G. Ground Twelve: Cumulative Error

As his twelfth ground for relief, Petitioner argues that the cumulative effect of error in his case warrants habeas relief. Respondent objects to the Court's review of this claim on the ground that there is no clearly established federal law holding cumulative error to be a cognizable basis for habeas relief. Although the Tenth Circuit has declined to "definitively resolve" the issue, it has made clear the district courts' duty to address cumulative error as a viable ground for relief. *See* <u>Littlejohn v. Trammell</u>, 704 F.3d 817, 869 (10th Cir. 2013), *see also* <u>Matthews v. Workman</u>, 577 F.3d 1175, 1195 n. 10 (10th Cir. 2009).

In reviewing for cumulative error claim, a court "aggregates all the errors that individually might be harmless [and therefore insufficient to require reversal], and it analyzes

whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless." U. S. v. Wood, 207 F.3d 1222, 1237 (10th Cir. 2000) (internal quotation and citation omitted). The Tenth Circuit Court of Appeals has repeatedly held that cumulative error analysis is applicable only where there are two or more actual errors. Workman v. Mullin, 342 F.3d 1100, 1116 (10th Cir. 2003). The cumulative impact of non-errors is not part of the analysis. Le v. Mullin, 311 F.3d 1002, 1023 (10th Cir .2002) (citing Rivera, 900 F.2d at 1470-71). "In the federal habeas context, the only otherwise harmless errors that can be aggregated are federal constitutional errors, and such errors will suffice to permit relief under cumulative error doctrine only when the constitutional errors committed in the state court trial so fatally infected the trial that they violated the trial's fundamental fairness." Matthews v. Workman, 577 F.3d 1175, 1195 n. 10 (10th Cir. 2009) (internal quotation omitted). "[T]he task 'merely' consists of 'aggregat[ing] all the errors that have been found to be harmless' and 'analyz[ing] whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless.' " Grant v. Trammell, 727 F.3d 1006, 1025 (10th Cir. 2013) (quoting Rivera, 900 F.2d at 1470). "Only if the errors 'so fatally infected the trial that they violated the trial's fundamental fairness' is reversal appropriate." Id. (quoting Matthews, 577 F.3d at 1195 n. 10). "[A]ll a defendant needs to show is a strong likelihood that the several errors in his case, when considered additively, prejudiced him." Id. at 1026.

The claim is exhausted, having been urged by Petitioner on direct appeal. The OCCA rejected the claim on the merits stating:

While certain errors did occur in this case, even considered together, they were not so egregious or numerous as to have denied [Petitioner] a fair trial. Therefore, no new trial or modification of sentence is warranted and this assignment of error is denied.

Jones, 201 P.3d at 894.

The OCCA's cursory cumulative error analysis considered whether the three or perhaps four harmless errors recognized by the court combined to deprive Petitioner of a fair trial. The three errors affecting the guilt stage of Petitioner's are as follows: (1) the trial court's exclusion of evidence of the decedents' methamphetamine intoxication; (2) the trial court's exclusion of the testimony of defense witness Robert Clark; and (3) the trial court's actual, though not plain error in admitting the hearsay testimony offered by police officer Ricky Hernandez. As discussed with respect to Ground Three, the trial court's erroneous admission of Officer Hernandez' hearsay testimony did not amount to a constitutional error. Thus, the only errors eligible for consideration as cumulative grounds for a new guilt-phase proceeding are the trial court's exclusion of methamphetamine-related evidence and its exclusion of the testimony of Robert Clark. Although the Court has deep concern with the manner in which the trial court deprived a capital defendant of evidence that was plainly relevant and material to his defense, it remains convinced that even when aggregated, these errors did not substantially influence the jury's determination of Petitioner's guilt. Habeas relief on Petitioner's Ground Twelve must, accordingly, be denied.

The remainder of the claims set forth in the Petition argue only for a new sentencing. Having already determined that Petitioner is entitled to such relief, the Court declines to address those claims.

## V. CONCLUSION

In accordance with the foregoing, the Court **DENIES** Petitioner's request, pursuant to 28 U.S.C. § 2254, for habeas relief from his convictions in Oklahoma County District Court, Case No. CF-2003-2046. For the reasons discussed above, however, the Court **CONDITIONALLY GRANTS** Petitioner's request for habeas relief from his death sentence. Because the trial court's exclusion of relevant evidence material to Petitioner's defense violated his rights under the United States Constitution, Petitioner's current death sentence cannot stand. The Court orders that the State of Oklahoma be given 180 days from the date of this opinion in which to conduct a new capital-sentencing proceeding in this case. Failure by the State of Oklahoma to conduct such a resentencing shall result in this Court's final vacating of Petitioner's death sentence. Having so ruled, the Court finds that Petitioner's remaining grounds for habeas relief from his death sentence are **MOOT**. A separate Judgment will enter accordingly.

**IT IS SO ORDERED** this 7th day of April, 2015.

LEE R. WEST
UNITED STATES DISTRICT JUDGE